ARTHUR YOUNG & CO., Appellant,

v.

Bob REVES; Robert H. Gibbs; & Frances Graham, Appellees.

Thomas E. ROBERTSON, Jr., As Trustee of the Farmer's Co-op of Arkansas and Oklahoma, Inc., and as representative of a class of members, depositors, and equity security holders, who are similarly situated to him; Bob Reves; Frances Graham; Robert H. Gibbs, individually; Robert H. Gibbs, as natural guardian of his minor children, Thomas A. Gibbs and Robert H. Gibbs, Jr.; and Robert H. Gibbs, as Trustee of the Muskogee Internal Medicine Group Profit Sharing Funds, Appellants,

v.

ARTHUR YOUNG & CO., Appellee.

Thomas E. ROBERTSON, Jr., As Trustee of the Farmer's Co-op of Arkansas and Oklahoma, Inc., and as representative of a class of members, depositors, and equity security holders, who are similarly situated to him, Appellees,

v.

ARTHUR YOUNG & CO., Appellant.

Thomas E. ROBERTSON, Jr., etc., et al.

v.

Jack WHITE, et al.

Thomas E. ROBERTSON, Jr., As Trustee of the Farmer's Co-op of Arkansas and Oklahoma, Inc., and as representative of a class of members, depositors, and equity security holders, who are similarly situated to him; Bob Reves;

Frances Graham; Robert H. Gibbs, individually; Robert H. Gibbs, as natural guardian of his minor children, Thomas A. Gibbs and Robert H. Gibbs, Jr.; and Robert H. Gibbs, as Trustee of the Muskogee Internal Medicine Group Profit Sharing Funds, Appellees,

v.

ARTHUR YOUNG & CO., Appellant.

Thomas E. ROBERTSON, Jr., etc., et al.

v.

Jack WHITE, et al.

Robert R. CLOAR, Class Counsel, Appellant,

v.

Bob REVES, Appellee.

Nos. 87–1726WA, 87–1727WA, 87–1803WA, 87–2533WA and 88–1014WA.

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1991.

Decided June 27, 1991.

Rehearing Denied Aug. 29, 1991.

John Matson, New York City, argued
(Kathryn A. Oberly, Washington D.C., Fred

Lovitch, Kansas City, Mo., and Carl D. Liggio and John Matson, New York City, on brief), for appellant.

John R. McCambridge, Chicago, Ill., argued (Jay R. Hoffman, Chicago, Ill., and Robert R. Cloar, Fort Smith, Ark., on brief), for appellee.

Before FAGG and MAGILL, Circuit Judges, and SNEED,[*] Senior Circuit Judge.

MAGILL, Circuit Judge.

| | | | |
| --- | --- | -------------------------------------------- | ---- |
| I. | | BACKGROUND | 1314 |
| | A. | The Co-op | 1315 |
| | B. | The Gasohol Plant | 1315 |
| | C. | The 1981 Audit | 1316 |
| | D. | The 1981 Audit Report to the Board | 1318 |
| | E. | The 1982 Annual Meeting | 1318 |
| | F. | The 1982 Audit | 1319 |
| | G. | The 1982 Audit Report to the Board | 1320 |
| | H. | The 1983 Annual Meeting | 1320 |
| | I. | Bankruptcy | 1320 |
| | J. | Trial | 1321 |
| | K. | Subsequent History | 1322 |
| II. | | ISSUES ON MAIN APPEAL | 1323 |
| | A. | Class Certification | 1323 |
| | B. | Robertson's Breach of Contract Claim | 1323 |
| | C. | The RICO Claim | 1323 |
| | D. | Demand Notes and Arkansas Law | 1324 |
| | E. | State Securities Fraud Claim | 1324 |
| | F. | The Rule 10b–5 Claim | 1327 |
| | G. | Arthur Young's Contribution Claim | 1333 |
| | H. | The Damages | 1334 |
| | I. | The Settlement Credit | 1337 |
| | J. | Conclusion | 1338 |
| III.| | ISSUES ON CONSOLIDATED APPEAL | 1338 |
| | A. | Interest | 1338 |
| | B. | Costs | 1338 |
| | C. | Fees | 1339 |
| | D. | Class Counsel | 1339 |
| | E. | Conclusion | 1339 |
| IV. | | CONCLUSION | 1339 |

Arthur Young appeals from the district court's entry of judgment against it after a jury found that the firm had violated both federal and state securities laws.[1] On appeal, Arthur Young argues that the district court erred in (1) certifying the plaintiff class; (2) holding that the financial instruments at issue in this case were securities under Arkansas law; (3) denying its motion for judgment notwithstanding the verdict on the state and federal securities claims; and (4) denying its motion for a new trial on the ground that a requested instruction on contribution was not given to the jury. Arthur Young also argues that the damages awarded to the appellees were not

---

[*] THE HONORABLE JOSEPH T. SNEED, Senior Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

1. This appeal is before us on remand after the Supreme Court reversed our earlier decision that the financial instruments at issue in this case were not federal securities. *See Reves v. Ernst & Young,* 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990), *rev'g Arthur Young & Co. v. Reves,* 856 F.2d 52 (8th Cir.1990). We had ruled that the instruments were not federal securities under the test from *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). *See* 856 F.2d at 55. The Supreme Court, however, declined to apply the *Howey* test, and instead applied the Second Circuit's "family resemblance" test, *see, e.g., Exchange Nat'l Bank v. Touche Ross & Co.,* 544 F.2d 1126 (2d Cir.1976), to conclude that the instruments were securities under federal law. 110 S.Ct. at 952.

supported by the evidence and challenges the district court's awards of attorney fees, costs, and interest to the appellees. On cross-appeal, Reves and Robertson challenge a number of the district court's rulings, including its dismissal of Robertson's breach of contract claim, its granting of summary judgment in favor of Arthur Young on Reves' RICO claim, its crediting of settlement proceeds against the jury's verdict, and its decision on fees for Reves' counsel. We affirm in part and reverse in part.

### I.

#### A. The Co-op

The facts of this case involve the Farmer's Cooperative of Arkansas and Oklahoma, Inc. (Co-op), which was organized in 1946 and operated in western Arkansas and eastern Oklahoma. Any farmer in the area could become a member, and as a member was entitled to one share and one vote. Each year the Co-op's members elected twelve of their own to serve on a Board of Directors. The Board met monthly to review the Co-op's operations, but delegated actual management of the Co-op to a general manager, whom the Board appointed. In 1952, the Board named Jack White as general manager. White served in that capacity until the Board removed him in mid-1982.

To raise money for its operating expenses, the Co-op sold promissory notes payable to the holder on demand. These demand notes, while uncollateralized and uninsured, were nonetheless attractive to investors because they paid a higher interest rate than that local financial institutions offered. The Co-op advertised the demand note program in its monthly newsletter as an "Investment Program." The advertisement stated the rate of interest the notes would earn and claimed: "YOUR CO-OP has more than $11,000,000 in assets to stand behind your investments. The Investment is not Federal [sic] Insured but it is ... Safe ... Secure ... and available when you need it. Interest is computed to the day of withdrawal." *See, e.g.,* Joint Appendix (JA) at 1820 (ellipses in original).

#### B. The Gasohol Plant

In 1979, the Co-op's general manager, White, joined with entrepreneur Edwin Dooley to finance and construct a gasohol plant. Dooley and White each invested $125,000 of their own funds and as a result each owned half of the enterprise, which was known as Big D & W Refining and Solvents, Inc. Dooley served as president of the corporation; White was its secretary. Construction of the plant began in June 1979. Four months later, White, financed by a loan from the Citizens Bank & Trust Company (Citizens Bank), purchased Dooley's interest in Big D & W and renamed the company White Flame Fuels, Inc. (White Flame).

Beginning in January 1980, White obtained loans from the Co-op to finance continued construction and the initial operation of the gasohol plant. White personally guaranteed these loans. The plant finally began producing gasohol the following April, but was soon beset by problems stemming from the plant's poor design and outside economic factors. White continued to obtain loans from the Co-op; by December 1980, these loans totalled approximately $4 million.

In September 1980, White was indicted for federal tax fraud. The indictment charged, among other things, that White had engaged in a course of self-dealing with the Co-op and had filed fraudulent tax returns. Also indicted with White was Gene Kuykendall, the Co-op's longtime accountant, who was also White Flame's accountant at this time.

Shortly after the indictment, at a November 12, 1980, Board meeting, White proposed that the Co-op purchase White Flame. The Board agreed and voted to acquire the company. One month later, however, the Co-op filed a declaratory action against White and White Flame in state court. The complaint had been drafted by White's attorneys, and alleged that on February 15, 1980, White had told the Board that all of White Flame's stock would be transferred to the Co-op in exchange for the Co-op's assumption of White's debts to the Co-op and Citizens

Bank.[2] The complaint alleged that in reliance on this agreement, the Co-op invested further sums in White Flame, based on the assumption that it owned the company. The complaint next alleged that White did not transfer the stock as agreed, and that the Co-op had not executed a note assuming White's debts to Citizens Bank. Based on these allegations, the Co-op sought a declaratory judgment stating that the Co-op had acquired White Flame on or about February 15, 1980; that the Co-op had assumed Jack White's debt to Citizen's Bank; that all amounts the Co-op lent to Jack White or White Flame before February 15, 1980, were investments in White Flame; and that Jack White was discharged from any debts to the Co-op relating to White Flame.

Shortly after the complaint was filed, White's attorneys sent the Co-op's attorney, Carl Creekmore, White's answer and a proposed consent decree. Creekmore filed the answer and obtained the state court's approval of the decree on December 19; but the decree was not filed until January 26, 1981. The decree provided that the Co-op had owned White Flame since February 15, 1980; that the Co-op had assumed White's debt to Citizen's Bank; and that White was discharged from any liability to the Co-op for loans for White Flame. The result of this friendly suit was that White was relieved of over $4 million of debt and that the Co-op owned White Flame as of February 15, 1980.

### C. The 1981 Audit

Both White and Kuykendall were convicted of tax fraud in January 1981.[3] Tes-

tifying on White's behalf at the criminal trial was Harry Erwin, the managing partner of Russell Brown and Company, Arkansas' largest accounting firm at that time.[4] Shortly after White's conviction, his lawyer contacted a member of Russell Brown and stated that the Co-op was interested in hiring the firm. In June 1981, Jack White and Kirit Goradia, the Co-op's office manager, met with Erwin and Joe Drozal, another member of Russell Brown. Later that year the Co-op hired Russell Brown to perform the Co-op's 1981 audit. Joe Drozal was named the partner in charge; Joe Cabaniss was selected to assist him.

After beginning the 1981 audit process in early 1982, Drozal became aware that there were problems concerning how White Flame should be treated for accounting purposes. In a January 26, 1982,[5] memo, Drozal raised several problems relating to the valuation and acquisition of White Flame. He observed that White Flame's records contained no detailed documentation of cost or expense allocations. Drozal also specifically noted that the Co-op's audited financial statement for 1980 had disclosed the Co-op's full ownership of White Flame, but had not disclosed that the Co-op had forgiven the $4 million in loans White had personally guaranteed. JA at 1189–91.

One of Drozal's first tasks in the audit was to determine White Flame's fixed asset value. Drozal realized that he could not rely on the fixed asset value provided for White Flame in the 1980 financial statement because Kuykendall, a convicted fel-

---

**2.** The minutes of the Co-op Board Meeting for February 15, 1980, do not contain any references to the Co-op acquiring the stock of White Flame. JA at 933. In fact, the first reference to the Co-op purchasing White Flame does not occur until the minutes of the November 12, 1980, Board meeting. JA at 1070.

**3.** This court affirmed these convictions in *United States v. White*, 671 F.2d 1126 (8th Cir.1982). The evidence in the criminal case showed that White had engaged in a course of self-dealing with the Co-op, and that he and Kuykendall had cooked the Co-op books and filed fraudulent tax returns to cover up White's activities. We concluded: "The record clearly demonstrates that

White and Kuykendall manipulated the Co-op's finances to serve their own personal ends, and that they distorted the Co-op's records of receipts...." *Id.* at 1134.

**4.** On January 2, 1982, Russell Brown merged with Arthur Young and Company. After the merger, Erwin was placed in charge of Arthur Young's Arkansas practice. Later, Arthur Young and Company became Ernst & Young. For the sake of consistency with the earlier opinions in this case, future references will be to "Arthur Young."

**5.** Russell Brown had merged with Arthur Young by this time. *See supra* note 4.

on, had prepared that statement. Therefore, Drozal had to determine it on his own. One way of determining fixed asset value is to add the asset's construction costs to its capitalized expenses. Drozal knew there was a problem with White Flame's reported capitalized expenses, because Jack White had told him that because the plant was only producing at 20% of capacity, they had included only 20% of their production costs as expenses; the remaining 80% of the production costs were added to the fixed asset value of the plant. Drozal's superior at Arthur Young informed him that only those costs reasonably associated with construction should be added to the plant's value. JA at 1215; 9 Tr. at 236. Drozal's investigation into the treatment of the production costs was limited mainly to talking with Jack White, and reviewing the construction costs and capitalized expenses reported in White Flame's books, which Drozal knew that Kuykendall had prepared. 9 Tr. at 186.[6] Drozal concluded, based primarily on information provided by convicted felons, that the plant's value at the end of 1980 was $4,393,242.66, exactly the same figure Kuykendall had calculated. JA at 1219. Using this figure as a base, Drozal factored in the 1981 construction costs and capitalized expenses, and concluded that White Flame's 1981 fixed asset value was approximately $4.5 million. *Id.*

Once Drozal determined White Flame's fixed asset value, he had to determine how that value should be treated for accounting purposes. This involved examining the circumstances of the Co-op's acquisition of White Flame. If the Co-op had owned White Flame from the beginning of construction in 1979, White Flame's value for accounting purposes would be its fixed asset value, $4.5 million. If the Co-op had purchased White Flame from Jack White, however, then White Flame's value for accounting purposes would be its fair market value at the time of purchase. Moreover, if the Co-op had purchased White Flame from White, the transaction would have to be closely scrutinized, because White was an officer of the Co-op. Drozal concluded that the Co-op had owned White Flame from the beginning, and thus that the plant should be valued at $4.5 million. He based this conclusion on the Co-op's having lent White funds for the plant's construction and operation; that White was supervising the construction and operation; and that the court decree stated that all of the Co-op's loans to White had been investments in the plant. 9 Tr. at 224. Drozal believed that characterizing White Flame as having always been owned by the Co-op reflected "economic reality." *Id.*

In concluding that the Co-op had always owned White Flame, Drozal ignored a great deal of information suggesting exactly the opposite. For example, although he relied on the court decree's statement that the Co-op's loans to White were really investments, Drozal ignored that part of the decree that stated that the Co-op had acquired White Flame on February 15, 1980. He ignored the facts that White Flame's tax returns indicated that it was owned by Jack White and Edwin Dooley; that each had initially invested $125,000 in White Flame; that White had eventually bought Dooley out; that White had always personally guaranteed the loans he received from the Co-op; and that the Co-op's 1979 audit contained no mention of White Flame. Drozal never talked with Dooley, with any 1979 or 1980 Board members, with the Co-op's lawyer, or with the Co-op's previous auditor.

By concluding that the Co-op had always owned White Flame, Drozal was able to avoid applying auditing standards that required a closer look at the actual acquisition and was also able to avoid having to value the plant at its fair market value. The advantage of reaching this conclusion was clear: Drozal knew that if White Flame were valued at less than $1.5 million, the Co-op's net worth for 1981 would have been wiped out. 10 Tr. at 41.[7] Dro-

---

6. Kuykendall testified that he fabricated these numbers on White's direction and attempted to cover up the scheme by slightly varying the percentages of costs expensed. 7 Tr. at 258.

7. One expert witness testified at trial that as of December 31, 1981, White Flame was not economically viable, and that its liquidation value was $500,000 to $700,000. 4 Tr. at 97. Another

zal also knew that bad news about the Co-op's financial condition could provoke a run on the demand notes and thus deprive the Co-op of its primary source of funds. 9 Tr. at 189.

### D. The 1981 Audit Report to the Board

On April 22, 1982, Arthur Young [8] presented its 1981 audit report to the Co-op's Board of Directors. Arthur Young concluded that with two exceptions, the Co-op's consolidated financial statements fairly presented the Co-op's financial position. The relevant exception stated that Arthur Young had "some doubt as to the recoverability of the investment in the gasohol plant of White Flame Fuels, Inc. and its continuing operations." JA at 235. The firm explained: "Management has not prepared projections and other analyses to assess the potential recovery of this investment. Accordingly, we are unable to satisfy ourselves as to the appropriate carrying value of such amounts as presented in the accompanying consolidated financial statements." *Id.*

The financial statements attached to the audit report listed the Co-op's assets at $20,869,300. Included in this total was $4,522,086 for the gasohol plant. The Co-op's liabilities totaled $18,246,743, including $12,164,007 in unredeemed patron demand notes. The Co-op's net worth was $2,622,-557. The financial statement's Note 9 addressed White Flame. The note stated, in relevant part:

> Financing of the initial construction and subsequent revisions which totaled approximately $4,522,000, was provided by the Co-op. Also, from the initial start of production through December 31, 1981, the Co-op has provided operating capital for White Flame. As of December 31, 1981, the Co-op had an investment of approximately $5,830,000 in White Flame. The ability of the Co-op to continue providing funds to cover the oper-

ating losses of White Flame Fuels, Inc. (currently averaging $100,000 per month) until such time that improvements in market conditions and production efficiency permit profitable operations are not determinable. The combination of factors as mentioned above, which must result favorably, cast doubt on the recovery by the Co-op of its investment in White Flame Fuels, Inc. and the recovery by White Flame Fuels, Inc. of its investment in plant and equipment on the basis of a going concern. Projections and other analyses have not been prepared by management in order to assess the potential recoverability of this investment.

JA at 251–52.

Arthur Young did not tell the Board that it concluded that the Co-op had always owned White Flame and thus was able to value the plant at $4.5 million. 9 Tr. at 227. Nor did it tell the Board that if the Co-op had purchased White Flame, as opposed to owning it from the beginning, there might be a net worth problem. Moreover, Arthur Young never specifically asked the Board or the Co-op's management for projections as to the operations of White Flame. 10 Tr. at 57–58.

### E. The 1982 Annual Meeting

On May 27, 1982, the Co-op held its annual meeting. Approximately 350 people attended. At the meeting, the Co-op distributed condensed financial statements that purported to convey the economic health of the organization.[9] The condensed financial statement for 1981 stated that the Co-op's assets were $20,869,300 and that its liabilities were $18,246,743, leaving the Co-op with a net worth of $2,622,557. JA at 1231. The statement included White Flame's $4.5 million asset value in its total assets, but did not include White Flame's $1.2 million loss. The statement also failed to include any of the information about

---

expert, who used a more sophisticated appraisal method, testified that White Flame's fair market value at the end of 1981 was between $444,000 and $1.5 million. 4 Tr. at 184. Arthur Young did not attempt to rebut this testimony.

**8.** *See supra* note 4.

**9.** The Co-op prepared these statements based on Arthur Young's audit report and the accompanying financial statement.

White Flame's status found in Note 9 of the audit report.

The condensed financial statement also contained the annual meeting's agenda. Listed as giving the financial report was "Harry C. Erwin, C.P.A., ARTHUR YOUNG & COMPANY." JA at 1241. Also present from Arthur Young was Joe Cabaniss. Erwin received the two condensed financial statements when he arrived at the meeting. He had no advance preparation as to the statement's contents. As he began his presentation, Erwin informed the members that they had condensed statements and that copies of the full audit were at the Co-op's offices. Erwin then started to discuss the condensed statement. The audience soon began asking questions about the acquisition of White Flame and its financial status. When asked how much money White Flame had lost, Erwin responded that it was a separate corporation under federal law. Erwin was also asked how the Co-op had acquired White Flame and responded that he thought the Board had voted to acquire it. During these interchanges, White Flame's $1.2 million loss was disclosed to the audience. The meeting began to get very heated, with the audience asking many questions about White Flame and other items in the condensed statement. As the questions increased in both frequency and intensity, Erwin was unable to respond and the Board moved the meeting on.

The result of Erwin's five-minute presentation was that the audience knew that the Co-op owned White Flame and that the plant had $1.2 million in losses. However, Erwin did not disclose the following: Arthur Young's conclusion that the Co-op had always owned White Flame; that as a result of this conclusion White Flame was valued at $4.5 million; the material in Note 9 of the full financial statement; that Arthur Young had qualified its audit opinion; that Arthur Young could not satisfy itself as to the proper carrying value of White Flame; or that a write-down of White Flame to its fair market value would wipe out the Co-op's net worth. 12 Tr. at 112–13.

### F. The 1982 Audit

The Co-op also hired Arthur Young to perform the 1982 audit. Erwin and Drozal were again Arthur Young's point men. Joe Cabaniss was again selected to work with Drozal and prepared a background memo on the 1982 audit. JA at 1234. The memo classified the Co-op as a "close monitoring client," i.e., a client that might pose some type of risk to Arthur Young. The memo also addressed issues of particular importance for the Co-op's audit. These included the recoverability of the gasohol plant and the condensed financial statements for 1981. As regards the gasohol plant, Cabaniss, before talking to Drozal, believed its acquisition involved a related party transaction, and hence that the Co-op had not always owned it. Cabaniss also expressed his doubts as to whether the gasohol plant could ever make money. As regards the condensed financial statements, Cabaniss noted:

> At the annual meeting the patrons are provided with condensed financial statements. Last year they were given a consolidated balance sheet and a Co-op only income statement which did not reflect the equity in the earnings (loss) of White Flame. We should advise the client of this misleading presentation and find an acceptable manner of presentation.

JA at 1240.

Arthur Young proceeded with the audit. Standard auditing procedures require the auditor to obtain a client representation letter. This letter, drafted by the auditor, but signed by the client's chief executive and financial officers, states that the client's financial records are accurate and consistent with generally accepted accounting principles. The Co-op's letter for the 1982 audit was signed by Fred Howard, who had replaced Jack White as the Co-op's General Manager. Kirit Goradia, the Co-op's office manager, who essentially functioned as its chief financial officer, did not sign the letter. In the space provided for signing one's name, Goradia wrote: "My only response is attached herewith not as

part of this letter." JA at 1245. The attachment stated: "This is to state that during the course of your 1982 audit of books and records of [the Co-op and White Flame], I have not intentionally withheld any information from you." JA at 1246. Goradia told Cabaniss that he did not want to sign the letter because if something happened later, he did not want to be accused of wrongdoing. 11 Tr. at 140. Normally, when a company's chief financial officer refuses to sign a representation letter, the auditor is supposed to disclaim the audit opinion or issue an adverse opinion. *Id.* at 142. Arthur Young, however, did not believe that Goradia had refused to sign the letter, and thus did neither.[10]

### G. The 1982 Audit Report to the Board

Arthur Young presented its 1982 audit report to the Board on March 7, 1983. The 1982 report was substantially similar to the 1981 report. Arthur Young again stated that "there is some doubt as to the recovery of the investment in [White Flame] and its continuing operation. Management has not prepared projections and other analyses to assess the potential recovery of this investment." JA at 258. Arthur Young again concluded: "Accordingly, we are unable to satisfy ourselves as to the appropriate carrying value of such amounts as presented in the accompanying consolidated financial statement." *Id.* Arthur Young's concerns were more fully explained in Note 8 to the financial statement, which was basically the same as the 1981 audit report's Note 9.

The 1982 financial statement reported that the Co-op had assets of $17,127,986 and liabilities of $15,741,240, resulting in a net worth of $1,386,746. The gasohol plant was listed as an asset worth $4,537,520.

### H. The 1983 Annual Meeting

The Co-op's 1983 annual meeting was held on March 24 of that year. Sometime before the meeting Goradia and Cabaniss discussed the Co-op's condensed financial statements. Cabaniss told him that Arthur Young's name should not be on the condensed statement because the statement would be misleading without the explanatory notes. Shortly before the meeting Cabaniss and Drozal received a copy of the condensed statement, which stated in bold-face letters across the top of the page: "The following financial information was condensed from Arthur Young & Company's Annual Audit." JA at 1248. Drozal and Cabaniss saw that Arthur Young's name was on the statement and that Note 8 was omitted, but said nothing to Goradia. 11 Tr. at 149.

The annual meeting's program stated that the financial report would be given by Arthur Young. Cabaniss began the financial report by informing the audience that they possessed condensed statements, and that full audit reports were at the Co-op's offices. He knew as he began that the condensed statement was misleading because it did not contain the explanatory notes to the audit. *Id.* at 150. The presentation lasted three minutes. Cabaniss did not tell the audience that the report was misleading. He did not tell them about Note 8, that Arthur Young was unable to satisfy itself as to White Flame's value, or that if White Flame was written down to its fair market value the Co-op might be in financial trouble. At that time, White Flame's stated value after depreciation was approximately $3.5 million. The Co-op's net worth was $1.3 million. If the plant had been written down to less than $2.2 million, the Co-op's net worth would have been wiped out.[11]

### I. Bankruptcy

The demand note program was not the Co-op's only source of funds. It also received loans and lines of credit from the Cooperative Finance Association (CFA),

---

**10.** Arthur Young did not get a signed client representation letter for the 1981 Co-op audit either. When asked about this at trial, Cabaniss responded: "Now, the year before, we thought we had that sucker, and ... we believed we had

it. There was no reason to even think it had been refused." 11 Tr. at 142.

**11.** *See supra* note 5 for the experts' appraisals of White Flame's value.

which was owned by Farmland, a regional supply cooperative. William Moon, a vice-president of CFA, had informed the Co-op that because of its reliance on demand notes, if the amount of invested notes dropped below $9.5 million, CFA would cut off the Co-op's line of credit. In the fall of 1983, CFA advanced the Co-op a $5.78 million line of credit to finance its grain inventory and operations. 3 Tr. at 46. In February of 1984, representatives of the Co-op met with CFA to arrange more financing. 12 Tr. at 12. Later that month the Co-op had a slight run on the demand notes. *Id.* The Co-op asked CFA for the money on its line of credit to protect itself from further runs. *Id.* CFA, because total demand note investments had dropped below $9.5 million, decided not to advance the Co-op any of the $800,000 the Co-op had remaining on its line of credit. 3 Tr. at 161. The Co-op then filed bankruptcy proceedings on February 23, 1984, to protect itself from a run on the demand notes. 12 Tr. at 13. In the subsequent bankruptcy disclosure statement, which the bankruptcy court approved on September 4, 1984, the Co-op asserted that three factors caused its bankruptcy: (1) ineffective management; (2) using demand notes as the primary source of financing; and (3) the financial problems of White Flame. AY Ex. 223. The result of the bankruptcy filing was that the demand notes were frozen in the bankruptcy estate, and thus were no longer redeemable at will by the noteholders.

## J. Trial

After the Co-op filed for bankruptcy, it remained as debtor in possession until October of that year, when the bankruptcy court appointed Thomas Robertson as trustee. On February 14, 1985, Robertson, on behalf of the Co-op and certain demand noteholders, filed suit against forty individuals and entities, including members of the Co-op's Board, the Co-op's lawyers, Jack White, Kirit Goradia, Gene Kuykendall, and Arthur Young. On September 27, 1985, the district court certified a class of noteholders consisting of people who purchased demand notes between February 15, 1980, and February 23, 1984, naming Bob Reves, Frances Graham, and Robert Gibbs the class representatives.[12] Robertson thus no longer represented the Class, but only the Co-op. Before trial, Robertson and the Class settled with all defendants except Arthur Young and Jack White's legal representatives.[13]

Robertson and the Class asserted seven claims against Arthur Young. Four of these claims are relevant to this appeal: (1) Robertson's claim that Arthur Young breached its auditing contract with the Co-op because the firm did not perform its audits in accordance with generally accepted accounting principles and auditing standards; (2) the Class' claim that Arthur Young induced the purchase of demand notes through the concealment of the Co-op's financial position in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5; (3) the Class' claim that Arthur Young induced the purchase of demand notes though the concealment of the Co-op's financial position in violation of Arkansas securities law; and (4) Robertson's and the Class' claim that Arthur Young was a material participant in the operation and management of the Co-op, in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968. Arthur Young then cross-claimed against the Co-op's Board of Directors, seeking contribution.

Before trial, the district court dismissed Robertson's action for securities fraud and Robertson's and the Class' breach of contract claim. *See Robertson v. White (Robertson I),* 633 F.Supp. 954, 974, 976 (W.D. Ark.1986). The district court also determined before trial that the demand notes were securities under both federal and Arkansas law. *See Robertson v. White (Robertson II),* 635 F.Supp. 851, 865 (W.D.Ark. 1986). Arthur Young then moved for summary judgment on Robertson's and the Class' RICO claim, which the district court granted. *See Robertson v. White (Robert-*

---

**12.** Future references to the noteholders will be to the "Class."

**13.** Subsequent to trial, Robertson and the Class settled with White's lawyers as well.

*son III)*, Nos. 85–2044, 85–2096, 85–2155, 85–2259, slip op. at 116 (W.D.Ark. Oct. 15, 1986).

Trial commenced on October 22, 1986, and lasted approximately a month. Robertson's and the Class' witnesses consisted mainly of Board members, accounting, legal, and appraisal experts, and Arthur Young personnel. Arthur Young's witnesses consisted mainly of Board members, a legal expert, and two state court clerks.[14] After trial, the jury found that Arthur Young had committed both state and federal securities fraud.[15] The jury found that the Class' damages as a result of the fraud totaled $6,121,652.94.

After the jury returned its verdict, the district court asked the parties to make all motions that might affect the judgment. Responding to these motions in a post-trial memorandum, the district court decided that sums the Class had already received as a result of settlements should offset the jury's verdict. *See Robertson v. White (Robertson IV)*, Nos. 85–2044, 85–2096, 85–2155, 85–2259, slip op. at 37 (W.D.Ark. Feb. 5, 1987). The district court also denied Arthur Young's motions for judgment notwithstanding the verdict (JNOV) on the state and federal securities claims. *Id.* at 49, 61. Finally, the district court rejected Arthur Young's argument that the court wrongly denied the firm's contribution claim. *Id.* at 54.

The district court's final judgment as regards Arthur Young was as follows:

> Arthur Young is ordered to pay to the Class $6,121,652.94, plus prejudgment interest, attorney fees (only on the state securities claim) and costs, under both state and federal claims, subject to a credit in the amount of $5,774,780, conditional on settlements with the Class being approved. The judgment shall bear prejudgment interest and carry an award of fees under the state act, and prejudgment interest under the federal securities law claims. Questions relating to the eligibility for fees under the federal claim, and the amount of any fees, shall be later determined. The court shall set a schedule for plaintiffs to file a bill of costs and a petition to establish the amount of prejudgment interest and fees due. The Class shall be allowed the larger net recovery under this Count, after allowing credits and determining fees, interest and costs.

Amended Judgment Order, Nos. 85–2044, 85–2096, 85–2155, 85–2259 (W.D.Ark. Apr. 23, 1987). Arthur Young, the Class, and Robertson appealed the various judgments, rulings and orders.

### K. Subsequent History

This case first came before us in 1988. *See Arthur Young & Co. v. Reves*, 856 F.2d 52 (8th Cir.1988). At that time we reversed the district court's judgment on the threshold issue of whether the demand notes were securities under federal or Arkansas law, holding that they were not. *See id.* at 55. Subsequently, the Supreme Court vacated our opinion and reversed, holding that the notes were securities within the meaning of § 3(a)(10) of the Securities Act of 1934, codified at 15 U.S.C. § 78c(a)(10) (1988). *See Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 953, 108 L.Ed.2d 47 (1990). On remand, we now

---

**14.** While reviewing the trial transcript after oral argument, we noticed that Board member Larry Heatherington, who was not listed in the transcript's table of contents, did testify. *See* 2 Tr. at 201–40. We also noticed that at least one part of the trial was not transcribed, namely, the closing argument of counsel for Jack White's law firm. *See* 16 Tr. at 130–33. Because of our concern with the integrity of the transcript, we requested counsel for Arthur Young and the Class to provide us with a list of the witnesses who testified. Robertson's list, which Arthur Young agreed was accurate, does not include Heatherington. We can only conclude that both parties relied on the transcript's various tables of contents. As a result, we still have reservations about the trial transcript's accuracy. Because apparently neither of the parties share our reservations, we will treat it as accurate.

**15.** Although not relevant to the issues on appeal, we note that the jury also found that Arthur Young negligently performed the Co-op's 1981 and 1982 audits, that the Co-op was contributorily negligent, and that Arthur Young had not committed common-law fraud in its performance of those audits.

address the plethora of issues the parties originally raised on appeal.

## II.

### A. Class Certification

■ Arthur Young argues as a threshold matter that the district court erred in certifying the Class. "A district court has broad discretion in determining whether to certify a class, and its determination will not be overturned absent a showing that it abused its discretion." *Gilbert v. City of Little Rock*, 722 F.2d 1390, 1399 (8th Cir. 1983), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984). The Class in this case consisted of all persons who had claims against Arthur Young, as well as the other defendants, "arising out of or based upon the ... demand notes." Sept. 27, 1985 Certification Order, JA at 1736. Although the record is far from clear on this point, it appears that the Class was made up of 1,685 people who bought demand notes from February 1980 until the Co-op's bankruptcy in February 1984.[16] The district court decided to certify the Class after reviewing de novo the United States magistrate judge's proposed findings and recommendations. The magistrate judge had concluded, after reviewing ample evidence and considering the relevant factors, that the proposed class of noteholders unquestionably satisfied the requirements of Federal Rule of Civil Procedure 23. On the record before us, we find no abuse of discretion.

### B. Robertson's Breach of Contract Claim

■ Robertson argues that the district court erred in dismissing his breach of contract claim against Arthur Young. In Count V of the complaint, Robertson alleged that Arthur Young breached its agreements with the Co-op to conduct the 1981 and 1982 audits in accordance with generally accepted accounting principles and auditing standards. Robertson asked that Arthur Young be held liable for all damages it caused and that it return the

fees the Co-op had paid it for services rendered. The district court dismissed Robertson's claim on the ground that the claim alleged misfeasance, i.e., that Arthur Young performed the Co-op's audits in a deficient manner, and that under Arkansas law, misfeasance is a tort, and not a contract, claim. *See Oliver v. Bluegrass Resources Corp.*, 284 Ark. 1, 678 S.W.2d 769, 770 (1984); *McClellan v. Brown*, 276 Ark. 28, 632 S.W.2d 406, 407 (1982); *Morrow v. First Nat'l Bank*, 261 Ark. 568, 550 S.W.2d 429, 431 (1977). We also note that under Arkansas law, the trial court may determine whether an action sounds in tort or contract. *See L.L. Cole & Son, Inc. v. Hickman*, 282 Ark. 6, 665 S.W.2d 278, 281 (1984).

Robertson concedes in his brief that his breach of contract claim is based on Arthur Young's misfeasance. He contends, however, that Arkansas' distinction between tort-based misfeasance claims and contract-based nonfeasance claims was not intended to prevent a party with a misfeasance claim from bringing a breach of contract cause of action. Robertson, however, adduces no support for this contention. It is clear that Robertson raises this issue on appeal because although the jury found that Arthur Young negligently performed the audits, it also found that the Co-op was contributorily negligent, a defense which Robertson admits is fatal to his negligence claim. Robertson and Class Brief at 64.

Because under Arkansas law Robertson's breach of contract claim actually sounds in tort, we conclude that the district court properly dismissed it.

### C. The RICO Claim

■ The Class argues that the district court improperly granted summary judgment in favor of Arthur Young on its RICO claim. The Class alleged in its complaint that Erwin, Drozal, and Cabaniss conducted or participated in the affairs of the Co-op, committing both mail fraud and securities fraud, in violation of 18 U.S.C. § 1962(c), which provides: "It shall be un-

---

16. For the purposes of the federal and state securities fraud claims, the Class consisted of all those who purchased notes after Arthur Young's first audit report to the Board on April 22, 1982.

lawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...."

Summary judgment is proper where, viewing the evidence in the light most favorable to the nonmoving party, and giving that party the benefit of all reasonable inferences to be drawn from that evidence, the movant is entitled to judgment as a matter of law. *See Agristor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). Viewing the evidence in the light most favorable to the Class, we agree with the district court that, as a matter of law, Arthur Young's involvement with the Co-op did not rise to the level required for a RICO violation. In *Bennett v. Berg,* 710 F.2d 1361 (8th Cir.) (en banc), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983), we addressed the nature of the participation required of a RICO defendant before liability is appropriate: "A defendant's participation must be in the conduct of the affairs of a RICO enterprise, which ordinarily will require some participation in the operation or management of the enterprise itself." *Id.* at 1364. Arthur Young's involvement with the Co-op was limited to the audits, meetings with the Board of Directors to explain the audits, and presentations at the annual meetings. In the course of this involvement it is clear that Arthur Young committed a number of reprehensible acts, but these acts in no way rise to the level of participation in the management or operation of the Co-op.

The Class contends that we should follow the Eleventh Circuit's decision in *Bank of American National Trust & Savings Ass'n v. Touche Ross & Co.,* 782 F.2d 966 (11th Cir.1986), where that court stated that it "is not necessary that a RICO defendant participate in the management or operation of the enterprise." *Id.* at 970. We are aware of the inconsistencies between the circuits regarding the necessary level of participation for RICO liability. *See Yellow Bus Lines v. Drivers, Chauffeurs & Helpers Local Union 639,* 913 F.2d 948,

952–55 (D.C.Cir.1990) (en banc) (reviewing the varied approaches to the participation requirement taken by the Second, Fourth, Fifth, Seventh, Eighth and Eleventh Circuits and adopting the Eighth Circuit's standard), *cert. denied,* — U.S. —, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). But until the Supreme Court rejects our standard or this court en banc overrules *Bennett,* we are bound to follow that decision. Therefore, we conclude that the district court properly granted summary judgment in favor of Arthur Young on the Class' RICO claim.

### D. Demand Notes and Arkansas Law

 Arthur Young next argues that the district court erred in holding that the Co-op's demand notes were securities under Arkansas law. We review de novo the district court's ruling on this state law issue. *See Salve Regina College v. Russell,* — U.S. —, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). The district court based its conclusion on three considerations: the legislative history of Arkansas' securities laws; Arkansas' broad, protectionist approach to securities regulation; and federal case law. *See Robertson II,* 635 F.Supp. at 855–65. As regards the third consideration, another Arkansas federal court has observed that "[t]he Arkansas definition of a security is essentially identical to the definition under federal securities laws." *See First Fin. Fed. Sav. & Loan Ass'n v. E.F. Hutton Mortgage Corp.,* 652 F.Supp. 471, 475 (W.D.Ark.), *aff'd,* 834 F.2d 685 (8th Cir.1987). We have carefully considered the district court's comprehensive legal analysis of this issue, and conclude, based on this analysis and the Supreme Court's decision that the demand notes are securities under federal law, that the demand notes are also securities under Arkansas law.

### E. The State Securities Fraud Claim

Arthur Young next argues that the district court erred in denying its motion for JNOV on the state securities fraud claims. In reviewing a district court's denial of a motion for JNOV, we

must consider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, [and] give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts. *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 989 (8th Cir.1989). We will affirm the denial, "if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence." *Id.*

■ Arthur Young argues that even accepting all of the Class' allegations as true, it cannot be held liable for securities fraud under Arkansas law. Under Arkansas law, civil liability for securities fraud exists for any person who

> [o]ffers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

Ark.Code Ann. § 23–42–106(a)(1)(B) (Michie 1987).[17] Arthur Young contends that it cannot be held liable under § 106(a) because it was neither an offerer or seller of securities. The Class does not contest this point, arguing that Arthur Young was not charged with primary liability under § 106(a), but with secondary liability under Ark.Code Ann. § 23–42–106(c), which provides:

> Every person who controls a seller liable under subsection (a) of this section ...; every partner, officer, or director of such

a seller or purchaser; every person occupying a similar status or performing a similar function; every employee of such a seller or purchaser who materially aids in the sale; and every broker-dealer or agent who materially aids in the sale are [sic] also liable jointly and severally with, and to the same extent as, the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.[18]

Section 106(c) expressly creates two types of secondary liability for securities fraud, control person liability and aiding and abetting liability. *See, e.g., Hogg v. Jerry*, 299 Ark. 283, 773 S.W.2d 84, 87 (1989). In denying Arthur Young's motion for JNOV, the district court reasoned that because Arthur Young "originated" the material statements that were used to sell the demand notes, "it obviously had the power to 'control' the content of those statements." *Robertson IV*, slip op. at 47. Arthur Young contends that the proper test for control person liability is whether the defendant "actually participated in (*i.e.*, *exercised* control over) the operations of the corporation in general," and if so, whether the defendant "possessed the power to control the specific transaction or activity upon which the primary violation is predicated." *See Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir.1985) (emphasis in original), *cert. denied sub nom. Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). We note in passing that Arthur Young certainly did not direct the Co-op's operations. We need not determine, however, whether the test for control person liability under 15 U.S.C. § 77*o* (1988) we established in *Metge* also applies to the Arkansas securities laws.

---

**17.** At the time of trial, this section was codified as Ark.Code Ann. § 67–1256(a)(2) (Michie 1980 Replacement). Section 67–1256 was modeled after § 410 of the Uniform Securities Act. Section 410(a)(1), (2) of the Uniform Act in turn was modeled after § 12(2) of the Securities Act of 1933, codified at 15 U.S.C. § 77*l*(2) (1988).

**18.** At the time of trial, this section was codified as Ark.Code Ann. § 67–1256(b) (Michie 1980 Replacement).

Rather, we believe that the other type of secondary liability for securities violations, aiding and abetting liability, applies to the facts of this case.

Section 106(c) explicitly makes liable for securities fraud any employee of the seller who materially aids in the sale of the security. As the Alabama Supreme Court has observed concerning its version of the same statute:

> A third category under the Alabama Act that goes beyond the comparable federal provision enumerates persons who cannot properly be considered control persons, such as employees of the seller or broker-dealers or agents who may have participated in the sale. The latter persons are included on the basis of what may be considered an express statutory aiding and abetting theory, since the employee, broker-dealer or agent must have "materially aid[ed] in the sale." Therefore, to hold a person liable a plaintiff need not show any active connivance or participation by the alleged control person, except in the case of an employee, broker-dealer, or agent; all he need do is establish the defendant's status, either as a controlling person, a partner, or an occupant of some other statutory classification ... plus the fact of the seller's liability. The defendant then is left with only one defense.... He may show that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the seller's liability is alleged to exist.

*Foster v. Jesup & Lamont Sec. Co.,* 482 So.2d 1201, 1207 (Ala.1986) (quoting Rediker, *Alabama's "Blue Sky Law"—Its Dubi-* *ous History and Its Current Renaissance,* 23 Ala.L.Rev. 667, 714 (1971)).[19]

■ The district court, in denying Arthur Young's motion for JNOV on this issue, did not discuss § 106(c), but instead relied on an amalgam of rather tenuous theories. *See Robertson IV,* slip op. at 40–48. Nonetheless, we believe the district court's instruction to the jury on the state securities claim fulfilled the requirements of § 106(c). The district court instructed the jury that to hold Arthur Young liable for violating Arkansas' blue sky law, it had to find: (1) that the Co-op sold demand notes to the Class by means of untrue statements or omissions of material facts; (2) that the Class did not know of the untrue statements or the omissions;[20] (3) that the untrue statements or the omissions "originated" with Arthur Young; (4) that Arthur Young knew that the statements were being communicated to the Class, and that they were material, "being of the kind and nature that a reasonable person would foreseeably rely on them;" and (5) that Arthur Young knew the statements were false when it made them. 18 Tr. at 79–80. Thus, the jury could only hold Arthur Young liable if it concluded that Arthur Young originated the untrue statements or omissions, knew that the statements were communicated to the Class, and knew that the Class would rely on them to purchase the demand notes; in other words, that Arthur Young "materially aided" in the sale of the demand notes. We note that the trial evidence provides ample support for the jury's verdict against Arthur Young on this issue.

■ Because we believe this instruction generally comports with the requirements

---

**19.** The Alabama statute provides:

Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale and every broker-dealer or agent who materially aids in the sale are [sic] also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know and in the exercise of reasonable care could not have

known, of the existence of the facts by reason of which the liability is alleged to exist.

Ala.Code § 8–6–19(b) (1984), *quoted in Foster,* 482 So.2d at 1208 n. 22. Section 8–6–19(b), like the Arkansas statute, is based on § 410 of the Uniform Securities Act. *See id.* at 1207.

**20.** Arthur Young also contends that the Class did not satisfy its burden of proof that it did not know of the omissions. That, however, is the theory behind the Class' securities claim in general. We believe that on the facts of this case, a sufficient showing was made.

of § 106(c), the only issue that remains is whether the district court's failure to instruct the jury that Arthur Young was not liable if it did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the Co-op's liability was alleged to exist, constitutes a ground for reversal. *See* Ark.Code Ann. § 23–42–106(c). We think not. The district court instructed the jury not to hold Arthur Young liable unless the firm "originated" the linchpin of the securities fraud. By establishing such a high threshold for liability, the district court, perhaps unintentionally, made sure that the jury would not hold Arthur Young liable if it did not know of the facts giving rise to the fraud. Therefore, that no specific instruction was given on this defense does not constitute a ground for reversal because the instruction that was given achieved the same result.

In sum, we believe that Arkansas law does provide for secondary liability for securities fraud in this case. The district court's instructions on this issue, while not precisely comporting with the requirements of § 23–42–106(c), did generally meet those requirements. As a result, the jury could have held Arthur Young liable only if it concluded that the firm materially aided in the sale of the demand notes. Thus, we conclude that the district court properly denied Arthur Young's motion for JNOV on this issue.

### F. The Rule 10b–5 Claim

#### 1. Background

Arthur Young next argues that the district court erred in denying its motion for JNOV on the federal securities claim because it was entitled to judgment as a matter of law. Rule 10b–5[21] provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce ...
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1990). The purpose behind Rule 10b–5 is to "transcend the gaps and limits of the common law actions available to securities traders injured by false representations or failures to disclose." R. Clark, Corporate Law 310 (1986). The rule has been referred to as "a judicial oak which has grown from little more than a legislative acorn," *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975) (Rehnquist, J.), and as "a horse of dubious pedigree but very fleet of foot." *See* L. Loss, Fundamentals of Securities Regulation 820 (1983). Our review of the case law has brought home the accuracy of these characterizations.

The essential components of a Rule 10b–5 claim are scienter, causation, and damages. *See Abbey v. Control Data Corp. (In re Control Data Sec. Litig.)*, 933 F.2d 616, 618 (8th Cir.1991). Primarily at issue in this case is causation, which has two elements. To satisfy the first element, a plaintiff must prove that the allegedly fraudulent acts caused the plaintiff to pur-

---

**21.** Rule 10b–5 implements 15 U.S.C. § 78*j* (1988), which states in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails ...
>
> (b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contri-

vance in contravention of such rules and regulations as the Commission may prescribe....

The Supreme Court has referred to § 10(b) as a "'catchall' clause to enable the Commission 'to deal with new manipulative [or cunning] devices.'" *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 203, 96 S.Ct. 1375, 1385–86, 47 L.Ed.2d 668 (1976) (bracketed material in original).

chase the securities. *See Harris v. Union Elec. Co.*, 787 F.2d 355, 366 (8th Cir.), *cert. denied*, 479 U.S. 823, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986). We have variously characterized this showing as a type of "causation in fact," *see Continental Grain (Austl.) Pty. Ltd. v. Pacific Oilseeds, Inc.*, 592 F.2d 409 (8th Cir.1979), "but for causation," *see Harris*, 787 F.2d at 366, "reliance," *see Austin v. Loftsgaarden*, 675 F.2d 168, 177 (8th Cir.1982), or as satisfying Rule 10b–5's "in connection with the purchase or sale of any security" requirement. *See Forkin v. Rooney Pace, Inc.*, 804 F.2d 1047, 1049 (8th Cir.1986).[22] In the *lingua franca* of Rule 10b–5 cases, however, this showing is usually referred to as "transaction causation." *See, e.g., Wilson v. Ruffa & Hanover, P.C.*, 844 F.2d 81, 86 (2d Cir.1988); *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988); *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 35 n. 5 (D.C.Cir.1987); *see also* Merritt, *A Consistent Model of Loss Causation in Securities Fraud Litigation: Suiting the Right to Fit the Wrong*, 66 Tex.L.Rev. 469, 471–72 (1988) (discussing transaction causation). Thus, for consistency's and simplicity's sake, we will refer to this showing as "transaction causation."

■ To satisfy the second causation element the plaintiff must prove that the allegedly fraudulent acts caused the plaintiff's economic harm. *See Austin*, 675 F.2d at 178. As with transaction causation, we have characterized this showing as a type of "causation in fact," *see Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 719 (8th Cir.1978); *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 562 F.2d 1040, 1049 (8th Cir.1977), *cert. denied*, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978), although the two showings are analytically distinct. Again, endeavoring to maintain some consistency with our sister circuits, *see, e.g., Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683–84 (7th Cir.), *cert. denied,*

—— U.S. ——, 110 S.Ct. 2590, 110 L.Ed.2d 2590 (1990); *Wilson*, 844 F.2d at 85; *Elias v. Arthur Andersen & Co. (In re Financial Corp. of Am. Shareholder Litig.)*, 796 F.2d 1126, 1130 (9th Cir.1986), and the commentators, *see, e.g.,* Merritt, 66 Tex.L.Rev. 469 *passim*, we refer to this showing as "loss causation."

### 2. Transaction Causation

With regard to causation, Arthur Young first argues that it is entitled to judgment as a matter of law because no one from the Class testified that they heard Arthur Young's presentation at the Co-op's annual meetings and thereafter bought demand notes. Because the Class' claim was based on Arthur Young's misrepresentations at the annual meetings, the firm contends, the Class had to prove that it relied on those misrepresentations in buying the demand notes. *See Vervaecke*, 578 F.2d at 717. The Class' failure to offer evidence of transaction causation, Arthur Young concludes, is fatal to its Rule 10b–5 claim.

■ The Class responds that because its claim is based primarily on Arthur Young's nondisclosure of material information about the Co-op's financial health, it is entitled to a rebuttable presumption of transaction causation. In making this argument, the Class relies on a long line of cases in which this court has stated that where the defendant's alleged conduct involves primarily a failure to disclose, the plaintiff need not prove transaction causation; instead, such causation will be inferred if the withheld information was material. *See Barnes v. Resource Royalties, Inc.*, 795 F.2d 1359, 1367 (8th Cir.1986), *cert. denied sub nom. McPherson v. Barnes*, —— U.S. ——, 110 S.Ct. 1129, 107 L.Ed.2d 1035 (1990); *Harris*, 787 F.2d at 366; *Austin*, 675 F.2d at 177; *St. Louis Union Trust Co.*, 562 F.2d at 1048–49. The inference is not conclusive; rather, it creates a rebuttable presumption of trans-

---

**22.** Indeed, the district court instructed the jury in this case: "The 'in connection with' aspect of this element is satisfied if you find that there was some substantial nexus or relation between the allegedly fraudulent conduct and the sale or purchase of securities." 18 Tr. at 73.

action causation. *See, e.g., Barnes*, 795 F.2d at 1367.

### a. Nature of the Class' Claim

■ The sub-issue thus becomes whether the Class' Rule 10b–5 claim is based on misrepresentation or nondisclosure. The district court concluded that the Class' claim was based on a nondisclosure theory and instructed the jury accordingly.[23] This is a conclusion of law that we review de novo. *See Vervaecke*, 578 F.2d at 718 n. 2. Of great relevance in determining this issue is how a claimant pleads its Rule 10b–5 claim: "While [plaintiff] tries to present this case to us as a case involving primarily nondisclosure, we have carefully examined the pleadings and do not view it as such." *See id.* at 717. In this case, the Class' complaint states its nondisclosure theory: "Defendants ... are liable because the accountants knew that they were inducing or causing the purchase of demand notes through *concealment* of the Co-op's financial condition." JA at 51 (emphasis added). We recognize that there is some analytical difficulty in separating misrepresentations from nondisclosures, because misrepresentations often result from the withholding of some material fact. On the facts and the pleadings in this case, however, we believe that the district court properly characterized this claim as one involving primarily nondisclosure.

Because the Class' claim was premised on a theory of nondisclosure, the Class was entitled to a rebuttable presumption that transaction causation had been shown. Although Arthur Young had notice in the early stages of this action that the Class was going to use the nondisclosure-based rebuttable presumption, *see* Proposed Report and Recommendation on Class Certification, JA at 1454 ("Reliance is unlikely to be an issue in a nondisclosure case...."), it did not attempt to rebut the presumption. For Arthur Young to argue now that it was entitled to judgment as a matter of law because the Class did not show transaction causation is a bold move indeed.[24]

### b. Duty to Disclose

Arthur Young raises a second sub-issue with regard to transaction causation, namely, that it could only be held liable for nondisclosure if it had a duty to disclose, and that because it had no such duty, it was entitled to judgment as a matter of law. In making this argument, Arthur Young relies on *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), where the Supreme Court stated that nondisclosure is actionable under Rule 10b–5, but that "such liability is premised upon a duty to disclose arising from a relationship of trust and confidence." *Id.* at 230, 100 S.Ct. at 1115.[25] Arthur Young argues that because there is no evidence that it had contacts with the Class, it had no relationship with the Class, and that it thus was under no duty to disclose.

■ A relationship for purposes of Rule 10b–5 liability, however, requires neither a "physical presence nor face to face conversation." *See SEC v. Washington County Util. Dist.*, 676 F.2d 218, 223 (6th Cir.1982)

---

**23.** The district court instructed the jury:
The second element which the Class must prove by a preponderance of the evidence is that the Class justifiably relied upon the defendant's statements or conduct. However, in order to satisfy this element, the Class need not prove that the Class actually relied on defendant's conduct. Rather, plaintiff's [sic] can satisfy his burden if he proves that the defendant sought to be charged omitted to state a fact to him, and that the omitted fact was material.
18 Tr. at 74–75.

**24.** We note that the district court failed to instruct the jury that the presumption of transaction causation (reliance) was rebuttable. However, Arthur Young has not raised this as a ground for reversal, which is understandable in light of its failure even to attempt to rebut the presumption.

**25.** Before *Chiarella*, this court had stated that the duty to disclose came from Rule 10b–5 itself. *See Myzel v. Fields*, 386 F.2d 718, 740 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). This statement is no longer accurate. *See, e.g., Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 496 (7th Cir.1986) ("[T]his duty does not come from § 10(b) or Rule 10b–5; if it did the inquiry would be circular. The duty must come from a ... relation outside securities law.").

(footnote omitted). Rather, whether a relationship exists that gives rise to a duty to disclose depends on the circumstances of the individual case. *See Roberts v. Peat, Marwick, Mitchell & Co.*, 857 F.2d 646, 653 (9th Cir.1988) (per curiam), *cert. denied*, —— U.S. ——, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989);. *Jett v. Sunderman*, 840 F.2d 1487, 1493 (9th Cir.1988); *Windon Third Oil & Gas Drilling Partnership v. Federal Deposit Ins. Corp.*, 805 F.2d 342, 347 (10th Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987); *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir.1986), *cert. denied*, 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987); *First Va. Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir.1977), *cert. denied sub nom. Walter E. Heller & Co. v. First Va. Bankshares*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). The Fifth, Ninth, and Eleventh Circuits have established a number of factors to be used in evaluating those circumstances, including (1) the parties' relative access to the information; (2) the benefit the defendant derives from the sale of the securities; (3) the defendant's awareness of the plaintiff's reliance on the defendant in making investment decisions; and (4) the defendant's role in initiating the sale. *See Jett*, 840 F.2d at 1493 [26]; *Rudolph*, 800 F.2d at 1043; *First Va. Bankshares*, 559 F.2d at 1314; *see also In re National Smelting of N.J., Inc. Bondholders Litig.*, 722 F.Supp. 152, 170–71 (D.N.J.1989) (applying the same analysis). In addition, the Eleventh Circuit also considers (5) the extent of the defendant's knowledge; (6) the significance of the nondisclosure; and (7) the extent of the defendant's participation in the fraud. *Rudolph*, 800 F.2d at 1043.

■ Therefore, we must examine the facts of this case in light of these factors to determine whether a relationship giving rise to a duty to disclose existed between the Class and Arthur Young at the time of the nondisclosure. The first factor, the parties' relative access to information, supports a duty to disclose: Arthur Young was the source of some of the information that was not disclosed, e.g., the assumption about the Co-op's always having owned White Flame, and was aware of the critical information that if White Flame was given a lower value, the Co-op's net worth would be wiped out.[27] The second factor, the benefit the defendant derives from the sale, supports a duty to disclose in this case, but only weakly. Arthur Young did benefit from the sale of the demand notes, but only because the Co-op was a client and the demand notes were the Co-op's primary source of financing. This sort of indirect benefit, however, does not count for much.

The third factor, the defendant's awareness that the plaintiff relied on it in making investment decisions, also supports a duty to disclose here. Arthur Young knew that the demand notes were a risky source of financing and that bad news could cause a run on the Co-op. Conversely, Arthur Young must also have known that good news would ensure that people continued to buy demand notes. It is important to understand the nature of the Co-op's demand note clientele. The Class consists primarily of farmers, pensioners, and others who lived in and around Van Buren, Arkansas. Many of the Class members invested all of their savings in the Co-op's demand note program. These were not sophisticated investors. Thus Arthur Young had to know that goods news about the Co-op's finances, or even the lack of bad news, would cause people to invest in the Co-op. As the Fifth Circuit has observed: "[T]he danger of misleading the public through a public accountant's know-

---

**26.** In *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir.1990) (en banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991), the Ninth Circuit stated that it would no longer use the "flexible duty" test. *Id.* at 1570. However, this statement was limited to the scienter element of a Rule 10b–5 violation and thus appears not to alter the duty to disclose analysis.

**27.** Although this factor supports a duty to disclose in this case, we do not afford it great weight in light of dicta found in the *Chiarella* decision: "A duty arises from the relationship between parties ... and not merely from one's ability to acquire information because of his position in the market." 445 U.S. at 231–32 n. 14, 100 S.Ct. at 1116 n. 14.

ing issuance of a false opinion is obvious. A public accountant performs an important public function and must be aware that the public places great faith in the probity of its opinions." *Fine v. American Solar King Corp.*, 919 F.2d 290, 298 (5th Cir. 1990), *petition for cert. filed*, 59 U.S.L.W. 3615 (U.S. Mar. 4, 1991) (No. 90–1372), *motion to defer consideration of petition granted*, 59 U.S.L.W. 3769 (U.S. May 13, 1991).

Although the fourth factor, the defendant's role in initiating the transaction, does not support a duty to disclose because Arthur Young played no active role in the purchase of the demand notes, the final three factors do. The fifth factor, the extent of the defendant's knowledge, clearly weighs in favor of a duty to disclose in this case because it is undisputed that Arthur Young knew everything the Class wishes had been disclosed. The sixth factor, the significance of the nondisclosed matters, also obviously supports the duty to disclose. Finally, the seventh factor, the extent of the defendant's involvement, supports the duty as Arthur Young's involvement ranged from its conclusion about the acquisition of White Flame to its valuation of the plant to its actions at the Co-op's annual meetings. Therefore, based on these factors, Arthur Young had a relationship to the Class such that the Class had placed its "trust and confidence," *Chiarella*, 445 U.S. at 232, 100 S.Ct. at 1117, in the firm.

Arthur Young argues that it would be unfair to impose a duty to disclose on it in this case because it had no means to satisfy that duty. This claim is preposterous. Arthur Young knew the condensed financial statements were misleading because they did not discuss the problems with White Flame. At the annual meetings Arthur Young could have said something, but simply chose not to. We wonder how difficult it would have been for Arthur Young, at either of the annual meetings, to inform the audience that there was something suspicious about the acquisition of White Flame, that Arthur Young had concluded that the Co-op had always owned the plant and relied on Kuykendall's numbers in valuing it, and that if White Flame were carried at a lower value, the Co-op might have a negative net worth. Given the importance of that information, the nature of the Co-op and the people who invested in it, the Co-op's location in a relatively rural area, and the interest of local news organizations in the Co-op's affairs, it seems sure that the Class would have heard what it now dearly wishes it had heard. Thus, Arthur Young could have satisfied its duty with perhaps two of the ten minutes it used to address the annual meetings in 1982 and 1983.[28]

Based on the unique facts and circumstances of this case, we hold that Arthur Young's relationship with the Class was such that it had a duty to disclose. Because of this duty to disclose, the Class was entitled to a rebuttable presumption of transaction causation. As Arthur Young did not attempt to rebut the presumption of transaction causation, the district court did not err in refusing to grant Arthur Young's motion for JNOV on the ground that the Class had not shown transaction causation.

### 3. Loss Causation

■ Arthur Young next argues that the district court erred in not granting its motion for JNOV on the ground that the

---

**28.** Arthur Young also relies on a line of Seventh Circuit cases for the proposition that it had no duty to disclose. *See DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *Latigo Ventures v. Laventhol & Horwath*, 876 F.2d 1322 (7th Cir.1989); *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928 (7th Cir.1988); *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490 (7th Cir.1986). These cases, however, do not apply to the case at hand because they all involve claims for aiding and abetting Rule 10b–5 violations against accounting firms that did not blow the whistle on their clients, as opposed to the primary Rule 10b–5 liability asserted here. *See, e.g., Latigo Ventures*, 876 F.2d at 1327 ("It is not the law that whenever an accountant discovers that his client is in financial trouble he must blow the whistle on the client for the protection of investors...."). Moreover, those cases feature vastly different factual circumstances and procedural postures. We do not believe these cases direct the result here.

Class failed to prove loss causation, that is, that Arthur Young's nondisclosure caused the Class' economic harm. *See supra* II. G.1. Arthur Young argues that the Class' economic harm was caused by the Co-op's bankruptcy, which, in turn, was directly precipitated by CFA's refusal to honor the Co-op's line of credit. Thus, Arthur Young argues, there is no loss causation because the bankruptcy was unrelated to the alleged fraud. Arthur Young's contention, while of some merit, is ultimately unavailing because of this court's broad test for loss causation. In our most recent Rule 10b–5 opinion, Chief Judge Lay observed: "Plaintiffs are not required to meet a strict test of direct causation under Rule 10b–5; they need only show 'some causal nexus' between [the defendant's] improper conduct and plaintiff's losses.... Traditional tests of proximate cause derived from tort principles are very much germane." *See Abbey v. Control Data Corp. (In re Control Data Corp. Sec. Litig.)*, 933 F.2d 616, 619–20 (8th Cir.1991) (citations omitted).[29] Thus, all the Class needed to show was that the Co-op's bankruptcy was somehow "related" to Arthur Young's nondisclosures. *See St. Louis Union Trust Co.*, 562 F.2d at 1049.

We believe the Class' evidence was sufficient on this issue. The Class showed that the Co-op would have had serious financial problems in 1981 had Arthur Young disclosed the information about White Flame. We are unable to say that Arthur Young's nondisclosure was unrelated to the Co-op's eventual bankruptcy.

Moreover, we note that one of Arthur Young's own exhibits refutes its contention that its nondisclosure was unrelated to the Co-op's bankruptcy. That exhibit contains the bankruptcy court's order approving the Co-op's disclosure statement to its creditors, along with the statement itself and the bankruptcy plan of reorganization. The disclosure statement, which the Co-op's bankruptcy counsel prepared, states that there were three reasons for the bankruptcy filing: problems with the Co-op's management, the Co-op's reliance on demand notes for financing, and most importantly for our analysis, *the financial problems associated with White Flame. See* AY Ex. 223.

Because a reasonable jury could have found that Arthur Young's nondisclosure contributed to the Co-op's bankruptcy, and hence the Class' injury, we hold that the district court did not err in refusing to grant Arthur Young's motion for JNOV on the issue of loss causation.

#### 4. Scheme to Defraud

Finally, Arthur Young argues that the district court erred because its instructions to the jury on the Rule 10b–5 claim were based on a scheme to defraud theory, that this theory is synonymous with a conspiracy theory, and that the district court had already determined that there was no conspiracy in this case. We do not believe that the limited references to scheme to defraud constitute reversible error in this case. Reading the instructions as a whole, *see Smith v. Hussmann Refrigerator Co.*, 619 F.2d 1229, 1245 (8th Cir.) (en banc), *cert. denied*, 449 U.S. 839, 101 S.Ct. 116, 66 L.Ed.2d 46 (1980), it is clear both that the jury was not required to find any sort of conspiracy, and that Arthur Young's conduct satisfied the elements of a Rule 10b–5 violation.

#### 5. Conclusion

In sum, the district court properly refused to grant Arthur Young's motion for

---

**29.** The district court's instruction on this issue was based on a theory of proximate cause:

The fourth element that the trustee must establish by a preponderance of the evidence is that the defendant's conduct was the proximate cause of the injury to the plaintiff.

In order for an act or omission to be considered a proximate cause of the injury, it must be a substantial factor in causing the damage, and the injury must have been either a direct result or a reasonable probable consequence of the act or omission.

In order to satisfy this element, the plaintiff need not prove that the defendant's conduct was the only cause of the plaintiff's injury. It is sufficient if you find that the actions of the defendant were a substantial and significant contributing cause to the injury which the plaintiff suffered.

*See* 18 Tr. at 78.

JNOV on the Class' Rule 10b–5 claim. As is apparent, the key to our resolution of this issue is the conclusion that Arthur Young had a duty to disclose material information to the Class. This duty was a necessary prerequisite to the Class' nondisclosure theory and the resulting shift in the burden of proof on the issue of transaction causation. Arthur Young has argued vehemently against the existence of such a duty, claiming, among other things, that finding such a duty will increase the costs of all audits and lessen the amount of accounting oversight because firms will be unwilling to pay the higher prices. This policy-based rationale, however, does not comport with the law, nor with common sense. It must be kept in mind that whether or not a duty exists will be determined on a case-by-case basis, and that the duty to disclose imposed in this case was based on unique facts and circumstances. We certainly doubt that other accounting firms will engage in the type of conduct that Arthur Young did in this case. More particularly, we hope that Arthur Young will not.

## G. Arthur Young's Contribution Claim

 Arthur Young next argues that the district court erred in not submitting its contribution claim against the Co-op's Board of Directors to the jury. Arthur Young contends that it submitted a contribution instruction on the securities claims, but that the district court did not offer any such instruction. The district court, in denying Arthur Young's motion for a new trial on this issue, concluded that Arthur Young did not make a specific objection at trial concerning the court's failure to instruct on the contribution claim, and moreover that the instruction Arthur Young allegedly tendered incorrectly stated the law. *Robertson IV*, slip op. at 37.

After reviewing the record, we conclude that the district court properly denied Arthur Young's motion for a new trial on this issue. On November 12, 1986, the district court informed counsel for all parties that they were to meet with his law clerks off the record and discuss the pros and cons of the proffered instructions, and that later all counsel would have an opportunity to go on the record in relation to the instructions. 16 Tr. at 201–03. On November 14, the district court conducted these on-the-record proceedings. At that time the district court stated:

> We are aware, in some detail, of the position of each of you, in relation to the issues that ought to be presented. What I'd like for you to do, because I understand that's all you need to do, in order to make your record to the Court of Appeals, is to tell me which of these instructions you think are wrong or should not be given, what additional instructions you think ought to be given and, very briefly, why.... Just do what you know is necessary, so that the Court of Appeals can see that you've made your record in relation to those instructions.

17 Tr. at 6. Counsel for Arthur Young objected to the proposed instructions as to contribution on Robertson's negligence claim against Arthur Young. *Id.* at 25. Counsel, however, mentioned nothing about contribution on the Class' securities claims. *Id.* at 18–26. The next day, counsel was given another opportunity to go on the record about the instructions after the district court read them to the jury. Counsel raised several new objections at this point, but again mentioned nothing about contribution against the Board on the Class' securities claims. 18 Tr. at 92–94.[30]

Federal Rule of Civil Procedure 51 states: "No party may assign as error ... the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." The purpose of Rule 51 is to "compel litigants to afford the trial court an opportunity to correct any error in the instructions and also to prevent the losing party from obtaining a new trial

---

**30.** Our conclusion that Arthur Young did not object to the failure to instruct based on our review of the transcript is also supported by

Arthur Young's failure to indicate in its briefs where it objected.

through relying on a possible error in the original trial." *Johnson v. Houser,* 704 F.2d 1049, 1051 (8th Cir.1983) (per curiam). As Wright and Miller have observed: "This purpose is well understood by the courts and the rule is applied in light of it. The necessity of a retrial is avoided when, by design or through sheer neglect, the losing party fails to make objection at the proper time." 9 C. Wright & A. Miller, Federal Practice and Procedure § 2551 (1971) (footnotes omitted).

We note that Arthur Young might have had a colorable claim for contribution against the directors. Ark.Code Ann. § 23–42–106(c) specifically provides for contribution in the case of secondary liability for securities fraud. However, "[e]rror in the instructions not properly objected to is waived unless the error is plain error in the sense that a miscarriage of justice would otherwise result." *Johnson,* 704 F.2d at 1051. The plain error exception is limited to the "exceptional case, in which error has affected seriously the fairness, integrity or public reputation of judicial proceedings." *Id.* at 1052. This is not such an exceptional case, and no miscarriage of justice has occurred, because it is clear that much of the blame for the fraud in this case is placed properly on Arthur Young.

Putting this in some perspective, we note that the jury received 100 instructions in this case; eighty pages in the trial transcript are devoted to the district court's reading of those instructions to the jury. *Id.* at 4–84. Arthur Young now complains about the district court's failure to offer one instruction, when the firm had several days' notice as to when the instructions could be objected to, and at least two opportunities specifically to object to those instructions. Arthur Young could have objected to the failure, but did not. We conclude that the locus of the responsibility for the failure to instruct lies with Arthur Young, and not the district court, and thus that the district court properly denied the firm's motion for a new trial.

## H. The Damages

### 1. Damages Evidence

Arthur Young next raises several issues concerning the damages awarded the Class. As an initial matter, Arthur Young challenges the competency of the Class' evidence on damages. That evidence consisted of a computer run showing the demand notes purchased between April 22, 1982, when Arthur Young made its first presentation to the Board, and February 23, 1984, when the Co-op declared bankruptcy and the demand notes were frozen in the bankruptcy estate. The computer run showed that the notes purchased between those dates totaled $6,121,652.94. The jury awarded the Class exactly this amount after holding Arthur Young liable for state and federal securities fraud.

Arthur Young raises two main arguments with respect to the competency of the computer print-out. First, it contends that the print-out included the demand notes which had been redeemed within the ninety days before the Co-op's bankruptcy. Arthur Young argues that because these Class members received payment in full on their notes, they have no damages. The Class argues that these noteholders were included because their redemptions would be revoked as preferential transfers, ostensibly under 11 U.S.C. § 547 (1988). Therefore, the Class argues, these "preference" noteholders "were included in the Class as if they actually held notes." Robertson and Class Brief at 43. Robertson and the Class argue that there was no point in forcing Robertson to prosecute actions against all of these individuals if Arthur Young was found liable, because Robertson would just seek a decree to stand in the shoes of those noteholders against Arthur Young.[31]

Arthur Young's second argument is that the $6.1 million figure for the total number of demand notes sold between April 22, 1982 and February 23, 1984, also includes notes that were bought before April 22, 1982. If an investor partially redeemed a note during that twenty-month period, the

---

**31.** The preference noteholders had redeemed $1,762,581.41 worth of notes. JA at 439.

remaining funds were re-issued as a new note. The Class' witness on the computer run admitted this at trial: "There was not [sic] assumption, no logic in the program at all to exclude anything at all except by the date of that note.... If the date of the note is 4–22–82. If that's what you call a rollover note, then yes, it would be included." 15 Tr. at 35.

■ We believe that both of these problems warrant reversing the award of damages in this case. Although the facts and the law certainly justify Arthur Young's liability for state and federal securities fraud, the damage award cannot stand. Arthur Young should not be charged with the $1.8 million the preference noteholders redeemed before bankruptcy, because at the time of trial the bankruptcy estate had not yet proceeded against them and there was no guarantee that the estate would succeed. Thus, until those noteholders suffer harm because of the bankruptcy, they have no damages.[32]

■ Arthur Young should also not be held liable to those whose initial investments in the Co-op occurred before April 22, 1982. In no sense can those noteholders be said to have relied on Arthur Young's nondisclosure (for the Rule 10b–5 claim), nor can it be said that Arthur Young aided the Co-op's commission of securities fraud before it met with the Board (for the state claim). Therefore, we reverse the award of damages and remand for a new trial on this issue. Liability having been established, the Class need only provide evidence of the amount of demand notes purchased for the first time between April 22, 1982[33] and February 23,

1984. This figure will not include the demand notes redeemed within ninety days of bankruptcy unless the district court determines that those noteholders have been injured by the bankruptcy sometime between the original trial and the new trial on damages.

2. Measure of Damages

■ Arthur Young next argues that the district court erred in applying rescissory damages[34] instead of out-of-pocket damages on the federal securities claim.[35] The district court's remedy functioned to transfer the demand notes from the noteholders to Arthur Young, which could then present the notes to the bankruptcy estate for payment. *See Robertson IV*, at 61–62. The district court selected this procedure because it greatly simplified a complex issue; benefited Arthur Young, in that the Co-op's bankruptcy estate had been significantly augmented by the various settlements in this case; and placed the Class in the same position it would have been in but for Arthur Young's fraud. *See id.* at 62–63.

Arthur Young contends that rescissory damages are only available where the defendant's benefit is greater than the plaintiff's harm. In making this argument, Arthur Young relies on *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), in which the Supreme Court stated that "the correct measure of damages ... is the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Id.* at 155, 92 S.Ct. at 1473. Arthur Young ignores, however, a more recent Supreme Court case that also

---

**32.** We are unable to determine from the record exactly what has happened as regards the preference noteholders. At one point the Class appears to argue that Robertson has not filed actions against them. Robertson and Class Brief at 43. However, in another brief, the Class states that Robertson has filed actions against the preference noteholders. Class' Fees and Costs Brief at 12. This issue should be resolved on remand.

**33.** If the Class had prevailed only on the Rule 10b–5 claim, the appropriate date would be May 27, 1982, the date of the Co-op's annual meeting.

**34.** Rescissory damages "contemplate a return of the injured party to the position he occupied before he was induced by wrongful conduct to enter into the transaction" and are the monetary equivalent of the property at issue. *See* Black's Dictionary 354 (5th ed. 1979).

**35.** Arthur Young concedes that rescissory damages are proper under the state securities fraud claim.

addressed the issue of damages in a Rule 10b–5 case. In *Randall v. Loftsgaarden*, 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986), the Supreme Court observed: "The issue whether and under what circumstances rescission or a rescissory measure of damages is available under § 10(b) is an unsettled one." *Id.* at 661, 106 S.Ct. at 3152. The Court, after noting *Affiliated Ute*, continued: "But there is authority for allowing the § 10(b) plaintiff, at least in some circumstances, to choose between 'undoing the bargain ... or ... requiring [the defendant] to pay [out-of-pocket] damages." *Id.* (quoting L. Loss, at 1133; latter bracketed material in original opinion). The Supreme Court, however, expressly reserved decision on the point by assuming, *arguendo*, that a rescissory recovery "may sometimes be proper on a § 10(b) claim." *Id.* Therefore, contrary to Arthur Young's assertion, *Affiliated Ute* has not foreclosed the question of whether rescissory damages were appropriate in this case.

This court has previously observed that although Rule 10b–5 damages are normally measured by the plaintiff's out-of-pocket losses, the "out-of-pocket rule is not a talisman." *See Garnatz v. Stifel, Nicolaus & Co.*, 559 F.2d 1357, 1360 (8th Cir.1977), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978). In *Garnatz* we remarked further, "Indeed, this court has shown no hesitation in varying that measure when necessary on the facts of a given case," and concluded, "Our function is to fashion the remedy best suited to the harm." *Id.* The Ninth Circuit has even opined that whether rescissory damages are appropriate is within the district court's discretion. *See, e.g., Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 621 (9th Cir.1981).

We believe that rescissory damages are best suited to the harm and to the facts of this case. Although we do not believe that simplification alone is a sufficient reason for applying this measure of damages, *see Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1343 (9th Cir.1976) (Sneed, J., concurring) ("Wrongdoing defendants should not be mulcted to make simple the management of a class proceeding under

rule 10b–5."), we do believe that rescissory damages are fair to both parties: the Class receives funds immediately, and Arthur Young has an opportunity to recoup from the Co-op's bankruptcy estate the damages it paid to the Class.

█ Arthur Young argues that rescissory damages are only proper where the plaintiff is in privity with the defendant. Otherwise, Arthur Young argues, it would be required to perform an impossibility: rescind a transaction to which it was not a party. *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 555 (5th Cir. Unit A Mar. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Arthur Young relies on a sophism to obscure the law, which is that when the circumstances of a case so dictate, privity is not required for the court to award *rescissory damages* in a Rule 10b–5 case. As the Eleventh Circuit has concluded: "Though we recognize the harshness of this result given that the defendants were not the actual sellers of the stock and therefore must 'rescind' by paying an amount they in fact never received, the substantial role played by the defendants provides adequate justification for the award." *Bruschi v. Brown*, 876 F.2d 1526, 1532 (11th Cir.1989) (quotation omitted). *See also Gordon v. Burr*, 506 F.2d 1080, 1085 (2d Cir.1974) (holding, in a Rule 10b–5 action, that "as between the innocent purchaser and the wrongdoer, who, though not a privy to the fraudulent contract, nonetheless induced the victim to make the purchase, equity requires the wrongdoer to restore the victim to the status quo.") We conclude that the district court properly determined that a rescissory measure of damages was appropriate based on the facts and circumstances of this case.

### 3. Calculation of Damages

██ Arthur Young next argues that even if rescissory damages were appropriate, the district court erred in its final determination of the damages because it included interest on the notes. Rescissory damages are measured as follows: "[T]he plaintiff is entitled to a return of the con-

sideration paid, reduced by … any 'income received' on the security." *Randall,* 478 U.S. at 656, 106 S.Ct. at 3149. Arthur Young argues that to measure the damages as of February 1984 for all of those who invested earlier than that, and hence earned interest, was error. We agree. Rescissory damages place a plaintiff in the same position she would have been in had she not been induced to enter into the transaction. *See* Black's Dictionary 354 (5th ed. 1979). Therefore, all the Class is entitled to is the return of its investment in the Co-op, not the investment plus its interest. Any interest the Class is entitled to would come as a result of this action, not the Co-op's program.

Unfortunately, we are not able to determine what actually happened as regards the interest on these notes. The Class' witness on the computer run did not testify on this issue and the record contains some confusing information. *See* JA at 440 ("The 'Amount Due' calculation represents the total amount of the notes plus simple interest on the notes at the rate indicated on the computer run minus the interest which was received by individuals on the notes."). Because it appears that the district court did not address this issue in its post-trial memorandum, *see Robertson IV,* at 61–66, and the Class has not addressed it in the briefs on appeal, we believe this is best dealt with on remand. Perhaps the awarded damages did not include interest and Arthur Young is wrong. Or it is possible that Arthur Young is raising this argument for the first time on appeal. On the record before us, however, we are unable to make any determination. Therefore, this issue should also be resolved on remand.

## I. The Settlement Credit

The Class contends that the district court erred in crediting $5,744,800 [36] in settlement proceeds against the $6,121,652.94 verdict against Arthur Young. During the course of the proceedings in this case, most of the defendants settled with Robertson and the Class. The settlements totaled approximately $8.2 million. Robertson and the Class agreed to split the settlement proceeds, allocating $5.6 million to the Class and $2.6 million to Robertson. It must be remembered that at this stage, the Class consisted of people who had purchased demand notes after February 15, 1980. The jury then determined that Arthur Young was liable for approximately $6.1 million in damages to the people who purchased demand notes after April 22, 1982. Because the district court fully credited the settlement proceeds against the jury's verdict, the Class argues, Arthur Young gets the benefit of settlements with Class members who had no claim against Arthur Young.

Under federal law, where a "settlement payment and the jury's award pertain[ ] inseparably to one and the same loss," the verdict must be credited with the payment on settlement. *See Kassman v. American Univ.,* 546 F.2d 1029, 1035 (D.C. Cir.1976) (per curiam); *see also Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 50 (2d Cir.) (holding that Rule 10b–5 damages must be offset by amount of settlement), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). Under Arkansas law, settlement payments must be credited against a verdict if the settling party is jointly liable with the party against whom the verdict is rendered. *See* Ark.Code Ann. § 16–61–204 (1987) (formerly Ark. Code Ann. § 34–1004 (Michie 1947)). For joint liability, both parties must be responsible for the same injury. *Id.* § 16–61–201. Even if the parties' tortious acts are temporally separate, if they caused the same injury or loss, the parties are jointly liable. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. First Nat'l Bank of Little Rock,* 774 F.2d 909, 916 (8th Cir.1985). The district court concluded that Arthur Young and all of the settling defendants were joint tortfeasors, and granted the credit on that ground.

---

**36.** This is more than the $5.6 million allocated to the Class before trial because it includes settlements reached during trial and other corrections made by the district court. *See* JA at 1434.

■ In this case, it is clear that the settlements were not all paid for the same loss. Some of the settling defendants, i.e., Co-op officers and directors, were released from various claims, including claims for common law fraud, negligence, and RICO violations. *See Robertson IV*, at 19. Therefore, under either the federal securities verdict or the Arkansas securities fraud verdict, the district court was not required to credit fully the settlement proceeds.

Having reached this conclusion, we still must address the proper allocation of the settlement proceeds. We must place the Class in the same position that it would have been in if not for Arthur Young's fraudulent acts. Therefore, on remand, the district court should first determine what the Class' damages are, as discussed above. The district court should then pro rata allocate the settlement proceeds to *all* members of the Class and credit Arthur Young with the settlement proceeds allocated to the post-April 22, 1982, demand note purchasers. Arthur Young thus will not receive the benefit of settlements received by those who had no claims against it, but neither will the Class as a whole be unjustly enriched.

### J. Conclusion

As regards the main appeal in this case, we affirm the district court's judgment in all respects except for the award of damages. We reverse that award and remand for a new trial on the issue of damages alone. At that time the district court shall conduct proceedings consistent with this opinion.

### III.

Consolidated with the main appeal in this case is Arthur Young's appeal on interest, costs, and fees, and the Class counsel's appeal on the issue of his fees.

### A. Interest

■ Arthur Young challenges the district court's calculation of pre- and post-judgment interest in this case. Because we have remanded for a new trial on the issue

of damages, the proper interest will have to be recalculated. To guide the district court, we make the following observations. First, whether to award prejudgment interest is a matter of judicial discretion. *See Blau v. Lehman*, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962). Second, even though Arthur Young is entitled to credit against the verdict as discussed above, Arthur Young is still liable for prejudgment interest on the entire verdict. Again, this is consistent with the rescissory measure of damages used in this case, and contrary to Arthur Young's suggestion, does not operate as a penalty. Third, 28 U.S.C. § 1961 specifically authorizes post-judgment interest, and we believe such interest is appropriate on both the damages and prejudgment interest in this case to compensate the Class for its investment and the interest the investment would have earned if not for Arthur Young's fraud. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 1576, 108 L.Ed.2d 842 (1990).

### B. Costs

■ Arthur Young next argues that the district court erred in awarding costs to Robertson and the Class. Arthur Young specifically argues that the district court erred in awarding costs to Robertson's counsel because he did not prevail on any claims and thus was not entitled to costs. *See* Fed.R.Civ.P. 54(d). Arthur Young overlooks the fact, however, that Robertson's counsel represented the Class before the Class counsel was appointed. Robertson and the Class also had a joint prosecution agreement, which provided that they would assist one another at trial. *See* JA at 2435. Having reviewed the transcript, we believe that much of what Robertson's counsel did at trial ultimately benefited the Class. In awarding costs to Robertson's counsel, the district court appears to have taken into consideration Robertson's counsel's lack of success on Robertson's claims, because it only awarded half of the costs requested. However, Robertson's counsel was only entitled to the costs reasonably associated with his representation of the

Class. From the record we are unable to determine whether the district court's costs award was reasonably related to the Class representation. Therefore, we reverse the award and remand for a redetermination of costs for Robertson's counsel.

■ Arthur Young also challenges the district court's award of costs to the Class. The decision whether to award costs to a prevailing party is committed to the discretion of the district court. *See Boyd v. Ozark Air Lines, Inc.,* 568 F.2d 50, 55 (8th Cir.1977); Fed.R.Civ.P. 54(d). Arthur Young first contends that the district court's award of $8755 in costs was error because the Class did not meet its burden of proof with regard to evidence of costs. The Class did meet its burden of proof as regards $7378 incurred in providing the initial notice to the Class. *See* JA at 2355–60. Class counsel also attested to approximately $1500 in copying costs, although there is no supporting documentation. List of Co-op Litigation Expenses of Class Counsel, *reprinted in* Arthur Young Brief on Costs, Appendix D. We do not believe that the district court's final award of $8755, however, constitutes an abuse of discretion on the facts of this case.

Arthur Young also argues that the district court erred in finding that it was not a prevailing party or, alternatively, that the district court abused its discretion in denying the firm's petition for costs. We believe that the district court neither erred nor abused its discretion in denying costs to Arthur Young. Arthur Young next argues that the district court's failure to allocate costs among all forty original defendants constituted an abuse of discretion. We disagree, and note also that Arthur Young has failed to adduce any relevant precedent in support of this claim.

### C. Fees

Arthur Young next challenges the award of attorney fees to Class counsel under Arkansas law. However, it appears from the record that the district court ultimately decided not to award any attorney fees under Arkansas law, because the larger net recovery was under the federal securities

claim. In *Grogan v. Garner,* 806 F.2d 829 (8th Cir.1986), we stated: "When a federal securities claim overlaps with a pendent state law claim, the plaintiff is entitled to the maximum amount recoverable under any claim." *Id.* at 839. In this case, the maximum amount recoverable was under the federal securities claim, and the district court thus did not award attorney's fees under Arkansas law. *See* Letter from District Court to all Counsel at 4 (Oct. 14, 1987), *reprinted in* Arthur Young Brief on Costs, Appendix B.

### D. Class Counsel

Finally, Class counsel appeals the district court's reduction of his fee from the common fund established for the Class out of the various settlements. Class counsel requested that $335,000 of the common fund be allocated to him as a fee. The district court, after much reflection, concluded "given all the circumstances that only someone who 'lived' through it' would know, that a reasonable fee for the services performed by [Class counsel] is $240,-000." *See* Letter from District Court to all Counsel at 1 (Oct. 20. 1987), *reprinted in* Class Counsel's Brief on Fees, Addendum. After having reviewed the record and the district court's reasoning, although we believe there is some merit to Class counsel's argument, we find no error in the reduction of his fee.

### E. Conclusion

In sum, we affirm the district court's ruling on costs and fees except for its determination of Robertson's counsel's costs. On remand, the district court should recalculate the appropriate interest and redetermine the appropriate costs for Robertson's counsel.

### IV.

Accordingly, the judgment of the district court is affirmed in part and reversed in part. In sum, we conclude that the district court: properly certified the Class; properly dismissed Robertson's breach of contract claim; properly granted summary judgment in favor of Arthur Young on the

RICO claim; properly ruled that the demand notes were securities under Arkansas law; properly denied Arthur Young's motion for JNOV on the state and federal securities fraud claims; properly denied Arthur Young's motion for a new trial on the contribution issue; erred in part on the damages awarded; erred in granting Arthur Young full credit for settlement proceeds; and properly determined all costs and fees except for the fees for Robertson's counsel. This matter is remanded to the district court for further proceedings as discussed above.