**A.I. CREDIT CORP., the CIT Group Equipment Financing, Inc. and Mitsubishi Electronics America, Inc., Plaintiffs,**

v.

**HARTFORD COMPUTER GROUP, INC., Paul Graffia, et al., Defendants.**

No. 91 C 6773.

United States District Court, N.D. Illinois, E.D.

March 9, 1994.

---

Frederick J. Sperling, Eugene J. Geekie, Jr., James Patrick Gaughan, Jr., Schiff, Hardin & Waite, Chicago, IL, for plaintiffs.

Stuart A. Shanus, Stephen J. O'Neil, Bell, Boyd & Lloyd, Chicago, IL, for Hartford Computer Group, Inc., Paul Graffia.

Matthew James Iverson, Jamie S. Freveletti, Burditt & Radzius, Chicago, IL, for Edwards, Williams, McManus, Ricciardelli and Coffey, P.C., Richard Frasier.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

The Plaintiffs in this action are lenders claiming that they were fraudulently induced to make loans to two corporations, Marine Capital Group, Ltd. (Marine) and Dreamstreet Holsteins, Inc. (Dreamstreet), by means of misleading financial statements and information provided by Defendants Hartford Computer Group (Hartford) and its officer, Paul Graffia. Some of these misrepresentations related to the finances of a third company in which both Dreamstreet and Marine were shareholders, Hera Resources, Inc. (Hera). The amended complaint (Complaint) asserts claims under both RICO and the common law. The Court has jurisdiction both by reason of the RICO claim under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) and by reason of diversity of citizenship under 28 U.S.C. § 1332.[1]

Hartford and Graffia have moved to dismiss the Complaint, contending that (a) the Plaintiffs have failed to show the "pattern of racketeering activity" required for RICO liability; (b) the fraud claims are not alleged with the particularity required by Rule 9(b), Fed.R.Civ.P.; (c) the Defendants had no reason to know of certain alleged misrepresentations; (d) the alleged fraud did not cause the Plaintiffs' losses; and (e) the Plaintiffs have not stated a claim for negligent misrepresentation.

### Background

According to the Complaint, Marine was a start-up company in the business of manufacturing floating fiberglass-reinforced docks, while Dreamstreet was in the business of selling investment syndications in Holstein dairy cattle and embryos. While it would be hard to imagine two more diverse businesses, Dreamstreet was a stockholder of Marine, and both businesses had investments in Hera, which was purportedly in the business of developing a natural gas lease in Colorado.

Marine needed money. In order to get it, Marine and Dreamstreet jointly entered into three loan transactions with the Plaintiffs. In May of 1987, they executed a promissory note to Hartford in the amount of $947,676.80. Hartford, through Graffia, resold the note in June to Plaintiff CIT Group/Equipment Financing, Inc. (CIT), receiving a broker's commission from CIT. Complaint ¶ 5. In October of 1987, Dreamstreet and Marine again entered into a joint loan transaction with Hartford in the amount of $947,634, which Hartford, through Graffia, brokered to Plaintiff A.I. Credit Corp. (AI) in April of 1988. Hartford again received a commission from the lender, AI. (Compl. at ¶ 17). In March of 1988, they entered into a third joint loan transaction with Plaintiff Mitsubishi

---

1. According to the undisputed allegations of the Complaint, Plaintiff A.I. Credit Corp. is organized under the laws of New Hampshire and has its principal place of business in New York. CIT Group/Equipment Financing, Inc. is organized under the laws of New York and has its principal place of business in Arizona. Mitsubishi Electronics America, Inc. is organized under the laws of Delaware and has its principal place of business in California. Defendants Hartford Computer Group and Paul Graffia are citizens of Illinois, while Jeanne A. Ralston is executor of the estate of John S. Ralston, Jr., a citizen of Rhode Island. Defendants Edwards, Williams, McManus, Ricciardelli, and Coffey, P.C., and Richard Frasier, citizens of New York, were dismissed without prejudice pursuant to Rule 41(a) on April 28, 1993.

Electronics America, Inc. (MELA) in the amount of $487,322.20. Again, Hartford, through Graffia, received a broker's commission from MELA. (Compl. at ¶ 16.)

In November of 1989, Dreamstreet and Marine notified the lenders that their loans were in default. Marine filed a bankruptcy petition and Dreamstreet dissolved. After liquidating their collateral, Dreamstreet and Marine still owed $389,591.85 to CIT, $578,-795.38 to AI and $240,341.38 to MELA. (Compl. at ¶¶ 20–22.) The Plaintiffs contend that Hartford and Graffia are liable to them because they participated in Dreamstreet and Marine's fraudulent scheme to induce them to make the loans.

## I. Misrepresentation of Dreamstreet's Business and Assets

On or about February 27, 1987, Dreamstreet's auditors, Defendants Edwards, Williams, McManus, Ricciardelli, and Coffey, P.C., and Richard Frasier (all of whom have been dismissed from this suit), "acting in concert with Ralston, Graffia and [Hartford]," (Compl. at ¶ 26), prepared and issued the audited financial statements of Dreamstreet for the fiscal years ending October 31, 1985 and October 31, 1986, (Compl.Ex. A), intending that they would be used to solicit loans from lenders such as the Plaintiffs.[2] The audit letter accompanying the financial statements stated that they fairly presented Dreamstreet's financial position in accordance with generally accepted accounting principles. (Compl. at ¶ 27.)

This was false, because the 1986 statements misrepresented the value of certain assets including the value of Dreamstreet's "cattle notes receivable." They also failed to disclose that Dreamstreet's primary business was the investment syndication of Holstein dairy cattle and embryos, that its income derived almost exclusively from the sale of such syndications, that the Tax Reform Act of 1986 had eliminated the tax advantages of such syndications, and that many of the makers of notes given in connection with the purchase of interests in such syndications had defaulted or would soon default. A properly prepared audit would have raised

significant doubt about Dreamstreet's ability to continue in business; these financial statements did not. (Compl. at ¶¶ 28–29.) The Complaint alleges that Dreamstreet's auditors were aware that the financial statements were false and misleading, Compl. at ¶ 30, but makes no such allegation as to Hartford or Graffia.

## II. Inflation of the Value of Hera

Dreamstreet acquired a 20% interest in Marine on or about February 27, 1987, and agreed to provide loan guarantees to Marine of up to $2,000,000. Marine owned 28% percent of Hera's capital stock. Hera was in the business of developing a lease of natural gas reserves in Gunnison, Colorado known as the "Gunnison Lease." In May 1987, Dreamstreet and Hera entered into a joint venture agreement in which Hera agreed to sell Dreamstreet 50,000,000,000 cubic feet of natural gas from the Gunnison Lease and Dreamstreet agreed to execute a promissory note payable to Hera in the amount of $50,-000,000. Dreamstreet also received an option to purchase 20% of the stock of Hera at a nominal price. (Compl. ¶¶ 31–34.)

Dreamstreet created a shell corporation, Dreamstreet Resources, Inc., to carry out the transaction. Dreamstreet Resources purchased 50,000,000,000 cubic feet of natural gas from Hera in exchange for a series of promissory notes in the face amount of $50,-000,000. This "sale" of natural gas permitted Hera to increase the value of the Gunnison lease on its financial statement from the amount it originally paid for it, approximately $280,000, to the value of the lease's "proven reserves," a figure approximately one hundred times that amount. (Compl. ¶¶ 35–37.) By causing its shell subsidiary, Dreamstreet Resources, to carry out the transaction, Dreamstreet avoided having to include the $50,000,000 promissory notes on its financial statements, but could include in its assets the value of its 20% interest in Hera. Included in Hera's assets, of course, was the $50,000,000 receivable from Dreamstreet Resources.

---

**2.** Like the Complaint, we will refer to these as Dreamstreet's 1986 financial statement.

On July 21, 1987, with the knowledge that they would be submitted to lenders on behalf of Dreamstreet and Marine, Graffia prepared the financial statements for Hera for the fiscal year ended June 30, 1987. (Compl.Ex. B.) The balance sheet listed as the company's greatest asset the $50,000,000 receivable from Dreamstreet Resources. These statements did not comply with generally accepted accounting standards and principles because they did not disclose the affiliation between Hera and Dreamstreet Resources, that the sale was a sham, and that on the date of the supposed transaction Dreamstreet Resources had not yet been incorporated. The financial statement misrepresented that Graffia was licensed as a C.P.A. by the state of Illinois and failed to disclose that Graffia was not a disinterested auditor, since he was engaged in brokering loans for Hera's shareholders, Dreamstreet and Marine. Graffia knew that Hera's 1987 financial statement and audit letter were false and materially misleading. (Compl. at ¶¶ 38–41.)

The false and misleading information contained in Hera's 1987 financial statement was incorporated in Marine's financial statement for the fiscal year ending June 30, 1987, prepared on or about August 14, 1987. The statement of assets listed the value of Marine's 28.57% investment in Hera at approximately $5.7 million, based on cost adjusted for undistributed earnings, but in a footnote gave the value of Hera's total assets as approximately $64 million and its net worth as approximately $48.3 million, following Hera's financial statement. (Compl.Ex. C.) Marine's financial statement also failed to disclose that Marine's investment in Hera was a related party transaction, that Hera's sale of gas was a sham, and that the financial statements relied upon information provided by Graffia, who was neither a C.P.A. nor a disinterested auditor. Had generally accepted accounting practices been followed, the financial statement would have disclosed a substantial doubt as to Marine's ability to continue in business. (Compl. ¶¶ 42–45).

In October 1987, Dreamstreet exercised its option to purchase 20% of Hera's stock. Dreamstreet's financial statement, prepared February 29, 1988 for the fiscal year ending

October 31, 1987, Complaint Exh. D, also included the misleading information regarding Hera. Dreamstreet's 20% share of Hera was valued at approximately $9 million. A footnote to Dreamstreet's financial statement repeated Hera's balance sheet figures from Hera's 1987 financial statements. The 1987 statements again failed to disclose the weaknesses in Dreamstreet's position and business prospects. Had generally accepted accounting practices been followed, the financial statement would have disclosed a substantial doubt as to Dreamstreet's ability to continue in business. (Compl. ¶¶ 48–51.)

On August 15, 1989, Graffia prepared and issued audited financial statements for Hera as of June 30, 1988 and June 30, 1989. (Compl.Ex. E.) These had the same shortcomings as Hera's 1987 financial statement, and were likewise false and materially misleading, although the fifty million dollar receivable was marked down substantially. (Compl. at ¶¶ 53–56.)

### III. *Hartford and Graffia's Brokering Activities*

In March of 1987, Hartford and Graffia, acting as loan brokers, solicited CIT on behalf of Dreamstreet and Marine and mailed it a copy of the 1986 Dreamstreet financial statements. Hartford and Graffia represented to CIT that Dreamstreet and Marine were borrowers with strong financial positions that met the creditworthiness standards of CIT. Relying on these representations, CIT purchased from Hartford the joint promissory note made by Dreamstreet and Marine. (Compl. ¶¶ 58–60.) After the purchase, Hartford and Graffia furnished CIT with copies of the 1987 financial statements for Hera, Dreamstreet and Marine, and Hera's 1988 and 1989 financial statements. CIT relied on these documents in determining that the borrowers were not in default. (Compl. ¶ 61.) The Plaintiffs declare on information and belief that in August 1987 Graffia and Hartford similarly solicited and induced Multibank Leasing Corporation (which is not a party to this suit) to purchase from Hartford a repayment agreement executed by Dreamstreet and Marine in favor of

Hartford, relying on these same financial statements. (Compl. ¶¶ 62–65.)

In February 1988, Graffia and Hartford approached MELA seeking a joint loan to Dreamstreet and Marine. Graffia and Hartford provided MELA with copies of the 1986 and 1987 Dreamstreet and Marine financial statements and the 1987 Hera financial statement. In reliance upon these documents, MELA made a loan to Dreamstreet and Marine in March 1988. Subsequently Graffia and Hartford provided MELA with the 1988 and 1989 Hera financial statements.

In February 1988, Graffia and Hartford approached AI and requested that it purchase a promissory note executed by Dreamstreet and Marine. As before, they "represented that Dreamstreet and Marine Capital were borrowers with strong financial positions that met the creditworthy [sic] standards required by [AI]." AI was provided with the 1986 and 1987 financial statements of both companies, and the 1987 Hera financial statement. AI purchased the promissory note, and thereafter Hartford and Graffia provided it with copies of the 1988 and 1989 Hera financial statements and audit letter. (Compl. at ¶¶ 70–73.)

## IV. *Theories of Recovery*

The Complaint consists of nine counts. Counts I and II allege that Graffia and Hartford were brokers representing the Plaintiffs and owed them a duty of disclosure regarding the creditworthiness of Dreamstreet and Marine. Count I alleges this duty was breached fraudulently, Count II that it was breached negligently. Counts III and IV are directed at Graffia alone; they allege that he breached his professional duty as an accountant in preparing Hera's financial statements by making either fraudulent and knowing misrepresentations (Count III) or negligent misrepresentations (Count IV), knowing that they would be used to solicit loans from the Plaintiffs and that the Plaintiffs would rely upon them. Counts V and VI assert claims against Dreamstreet and Marine's accountants, who have been dismissed from this suit. Count VII is a claim of fraud against the estate of John Ralston. Count VIII is a fraud claim directed against all Defendants.

Count IX is that familiar travelling companion of fraud suits, a civil RICO claim. The Plaintiffs allege that Dreamstreet and Marine constituted an association-in-fact RICO "enterprise" that engaged in a pattern of racketeering activity by using the mails to send copies of the false and misleading financial statements of Dreamstreet, Marine and Hera to the Plaintiffs, thus committing mail fraud. Hartford and Graffia's liability is predicated on their being associated with the enterprise and conducting or participating in the conduct of its affairs. (Compl. at ¶ 133.) Hartford and Graffia have raised several objections to the counts against them.

### Discussion

On a motion to dismiss, the court views the allegations of the complaint as true, along with reasonable inferences therefrom, and views these in the light most favorable to the plaintiff. *Dawson v. General Motors*, 977 F.2d 369, 372 (7th Cir.1992); *Powe v. Chicago*, 664 F.2d 639, 642 (7th Cir.1981). A complaint should not be dismissed with prejudice unless it appears beyond doubt that the plaintiff is unable to prove any set of facts consistent with the complaint which would entitle the plaintiff to relief. *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir.1992). Unless otherwise provided by Rule 9 of the Federal Rules of Civil Procedure, facts need not be plead with particularity. *Leatherman v. Tarrant County Narcotics and Intelligence Unit*, —— U.S. ——, ——, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993). However, we need not credit conclusions of law. *See Reichenberger v. Pritchard*, 660 F.2d 280, 282 (7th Cir.1981); *Mescall v. Burrus*, 603 F.2d 1266, 1269 (7th Cir.1979). *See also* 5A Charles Wright and Arthur Miller, *Federal Practice and Procedure*, § 1357 at 311–18 (2d ed. 1990). Nevertheless, a plaintiff must allege sufficient facts to outline the cause of action, proof of which is essential to recovery. *Ellsworth v. Racine*, 774 F.2d 182, 184 (7th Cir.1985), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986) (citations omitted).

## I. *Fraud*

The Defendants attack the fraud allegations on two´ grounds, Rule 9(b) and loss causation. We address both issues in turn.

## A. Rule 9(b)

▮ Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). This means that the complaint must state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated...." *Schiffels v. Kemper Fin. Servs., Inc.,* 978 F.2d 344, 352 (7th Cir.1992) (quoting *Banker's Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992)). *See also DiLeo v. Ernst & Young,* 901 F.2d 624, 626 (7th Cir.1990) (the Seventh Circuit held that plaintiffs must plead the circumstances constituting fraud in detail—the "who, what, when, where, and how ...*"*), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.,* 927 F.2d 988, 992 (7th Cir.1991) ("Parties pleading fraud in federal court, must state the time, place and content of the alleged communications perpetrating the fraud"). Rule 9(b), however, must be read in conjunction with Rule 8, which requires a short and concise pleading. *Tomera v. Galt,* 511 F.2d 504, 508 (7th Cir.1975); *Fujisawa Pharmaceutical Co. v. Kapoor,* 814 F.Supp. 720, 726 (N.D.Ill.1993); *Unytite, Inc. v. Lohr Structural Fasteners, Inc.,* No. 91 C 2849, 1992 WL 220918, at *2 (N.D.Ill. Sept. 1, 1992) (Plunkett, J.).

▮ Read together, these Rules require that the time, place and contents of fraud be pleaded, but the complainant need not plead evidence. *Fujisawa,* 814 F.Supp. at 726; *Dynabest, Inc. v. Yao,* 760 F.Supp. 704, 707 (N.D.Ill.1991). Rule 9(b) is not to be read blindly, but is to be applied in order to effectuate the purposes of the rule which are: (1) to inform the defendants of the claims against them and to enable them to form an adequate defense; (2) to eliminate the filing of a conclusory complaint as a pretext for using discovery to uncover wrongs; and (3) to protect defendants from unfounded charges of fraud which may injure their reputations. *Fujisawa,* 814 F.Supp. at 726; *Reshal Assoc., Inc. v. Long Grove Trading Co.,* 754 F.Supp. 1226, 1230 (N.D.Ill.1990)

(citations omitted). *See also Bankers Trust Co. v. Old Republic Ins. Co.,* 697 F.Supp. 1483, 1484–85 (N.D.Ill.1988) (Moran, J.) (citations omitted). Rule 9(b) applies both to common law fraud and allegations of federal mail fraud as predicate acts for a civil RICO claim. *Graue Mill,* 927 F.2d at 992.

▮ We agree with Graffia that the Complaint's account of Graffia's statements on behalf of Hartford to the four lenders does not meet this test. The Complaint recites only that Hartford and Graffia represented to each lender that Dreamstreet and Marine were borrowers with strong financial positions that met the lender's creditworthiness standards. The representatives of the lenders receiving these communications were not named. Only the month, not the date, of each communication was given, and no location is mentioned. The content of each communication is given only in vague and general terms. There is no excuse for such vagueness, since, with the exception of the representations to non-party Multibank, these representations were made to the Plaintiffs themselves. If liability is to be predicated upon these communications the Plaintiffs will have to replead them.

Plaintiffs cite *Capalbo v. Paine Webber, Inc.,* 672 F.Supp. 1048, 1050 (N.D.Ill.1987) (Norgle, J.), which stated in a securities-fraud claim having several plaintiffs that the plaintiffs did not need to identify which particular misrepresentation was made to each plaintiff. The court stated that a complaint was sufficient if it sets forth (1) when the misrepresentations were made; (2) where they were made; (3) the particular contents of the misrepresentations; (4) the identity of the party making them; and (5) the consequences of the misrepresentations.

▮ Even if *Capalbo* is correct and the plaintiffs did not need to plead *to whom* the misrepresentations were made, element (3) is doubtful here and element (2) is missing. But we also respectfully disagree with *Capalbo* on the basis of later authority. In *Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 540 (9th Cir.1989), the Ninth Circuit affirmed the district court's refusal to accept an amended complaint in a securities

fraud suit, noting that the proposed complaint did not specify which plaintiffs received which prospectus. The court stated that "Rule 9(b) requires that the pleader state the time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Id.* at 541. *See also Graue Mill,* 927 F.2d at 992–93 (*citing* with approval Ninth Circuit's requirement in *Moore* that complaint state the identities of the parties to the misrepresentations); *QO Acquisition Corp. v. The Julien Co.,* No. 88 C 6050, 1990 WL 16459, 1990 U.S. Dist. LEXIS 1467 (N.D.Ill. 1990) (Plunkett, J.).[3]

■ We also agree with Graffia and Hartford that the complaint does not adequately charge either of them with fraud in connection with the 1986 Dreamstreet financial statements. There are no allegations that either Hartford or Graffia knew that Dreamstreet's business depended upon cattle syndications, that changes in the tax laws had rendered its business uneconomical, and that makers of notes constituting a major portion of Dreamstreet's assets were likely to default. Although these financial statements were allegedly prepared by Dreamstreet's auditors "acting in concert" with Graffia and Hartford, (Compl. at ¶ 26), there is no allegation that either Graffia or Hartford had any responsibility for verifying them. The Complaint alleges that the auditors were aware that the financial statements were false and misleading, (Compl. at ¶ 30), but makes no such allegation as to Hartford or Graffia.

■ The Plaintiffs point to paragraph 79 which states that "Graffia and [Hartford] knew or should have known that the Dreamstreet Financial Statements, the Marine Capital Financial Statements, and the Hera Financial Statements contained false information...." The bald statement that they knew or should have known about *both* frauds is doubly ambiguous. "Should have known" is a conclusion, but the Plaintiffs have not made allegations from which we may infer either notice or a duty of inquiry. And the only fraud that affected all three statements was the misrepresentation of Hera's sale of gas. The reasonable meaning of this paragraph in the context of the Complaint as a whole is that Graffia and Hartford knew or should have known that the Dreamstreet and Marine financial statements contained false information *because* they contained false information taken from the Hera statements. While we are required to draw all reasonable inferences in the Plaintiffs' favor, we do not think it reasonable to infer that Graffia or Hartford knew of the falsity of the other misrepresentations when there is nothing in the allegations of the Complaint explaining how they could have learned it.

## B. *Loss Causation*

Without these allegations we are left with Graffia's preparation of fraudulent financial statements for Hera and Graffia's and Hartford's transmitting them to the Plaintiff lenders, together with the financial statements of Dreamstreet and Marine that were tainted by them. The Plaintiffs allegedly loaned money in reliance on these financial statements and were not repaid, a straightforward case of fraud. But Hartford and Graffia object that the Plaintiffs have not alleged "loss causation." Even if the Hera financial statements were true, they argue, Hera would not have received payment under the notes for ten years. Income resulting from the notes could not have reached Hera's shareholders, Dreamstreet and Marine, in time for them to pay their debts to the Plaintiffs. The Plaintiffs would have lost their money anyway, hence causation has not been shown. (Pl.Br. at 11–12.)

■ Loss causation is merely an exotic name for the tort concept of causation: the plaintiffs must show that, but for the defendant's wrongdoing, they would not have suffered the harm they complain of. *Bastian v. Petren Resources Corp.,* 892 F.2d 680, 685 (7th Cir.), *cert. denied,* 496 U.S. 906, 110

---

3. We note that under Illinois law the identity of the persons to whom misrepresentations are made is one of the "particulars" which must be pleaded. *Board of Education v. A, C and S, Inc.,* 131 Ill.2d 428, 137 Ill.Dec. 635, 649, 546 N.E.2d 580, 594 (1989). While normally decisions under Illinois' "fact pleading" regime have no application under the "notice pleading" Federal Rules, Rule 9(b) is an express exception to notice pleading.

S.Ct. 2590, 110 L.Ed.2d 270 (1990); *Fujisawa*, 814 F.Supp. at 727. A plaintiff must allege that the loss would not have occurred if the facts were what he believed them to be. *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988). In order to establish loss causation, a plaintiff must show that he would not have acted had he known the truth and also that the untruth was in some "reasonably direct or proximate way responsible for his loss." *Lewis v. Hermann*, 775 F.Supp. 1137, 1150 (N.D.Ill.1991) (citations omitted).

 The Plaintiffs have correctly stated the law of loss causation. However, in deciding a motion to dismiss we may not go beyond the pleadings without converting the motion to one for summary judgment. The loan documents are not part of the Complaint, and the Complaint does not state when the Plaintiffs' loans to Dreamstreet and Marine fell due. Hartford and Graffia have offered no evidence on the point, although their assertion that the loans had a shorter term is undisputed.

 In any event, we think reasonable inferences from the alleged facts support a plausible theory of loss causation. True, by their terms, no payments would be made under the notes for ten years. But long-term obligations (of solvent and responsible obligors) are routinely discounted and sold in advance of their maturity. The financial statements did not disclose that the "purchaser" of Hera's gas was a related party with no business and no assets. Normally one does not accept notes for fifty million dollars when there is no reasonable prospect of payment. (The notes were secured by the gas to be sold, but it is hard to imagine a more fugacious collateral.) If the facts had been as impliedly represented, that the purchase was a bona fide transaction, it is reasonable to infer that the notes would have been worth *something*, and the fact that they

were worthless could have caused at least some of the Plaintiffs' losses.[4]

 Further, assuming for the moment that Plaintiffs' losses resulted from misrepresentations relating to Dreamstreet's business rather than Hera's, Graffia and Hartford may nevertheless be liable for them as joint tortfeasors. Although the Complaint does not sufficiently allege either that Hartford and Graffia knew of the misrepresentations regarding Dreamstreet's business or made misrepresentations to the lenders other than those made in, or derived from, Hera's financial statements, it does allege that Hartford and Graffia were knowing participants in a scheme to defraud the Plaintiffs. Normally one who participates in a tort may be held liable for the entire loss even though not all of it is proximately caused by him. See W.L. Prosser and W.P. Keeton, *The Law of Torts* 322–24 (5th ed. 1984). According to the Second Restatement:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (1979). This section of the Restatement has been followed in Illinois. *Sanke v. Bechina*, 216 Ill.App.3d 962, 160 Ill.Dec. 258, 259, 576 N.E.2d 1212, 1213 (1991), *appeal denied*, 142 Ill.2d 665, 164 Ill.Dec. 928, 584 N.E.2d 140 (1991). Either (a) or (c) could render Graffia, and perhaps Hartford, liable for the mis-

---

4. We point out that normally holders of less than a majority of a corporation's stock have no power to cause the corporation to compel the payment of dividends unless such power is designed into the corporate structure. So even if Hera could have sold the notes, we are not told how Dreamstreet and Marine could have compelled it to do so or to distribute the proceeds so that they would be available to pay the loans. Ralston, a principal shareholder of Hera, was a shareholder of Marine and may have been a party to the loan transactions. Hartford and Graffia have not raised that objection, and we need not address it further.

representations of Dreamstreet and Marine. Because the Plaintiffs may be able to show loss causation, the fraud counts should not be dismissed on that ground.

## II. *Count VIII*

██ Hartford and Graffia asked that Count VIII be dismissed because there is no independent tort of conspiracy to commit fraud. The Plaintiffs responded that they were alleging fraud as such, in which Hartford and Graffia participated, rather than a conspiracy. In reply, Hartford and Graffia contended that this was unnecessary, because Count I alleged fraud against Hartford and Graffia in their capacity as a broker and against Graffia in Count III in his capacity as an accountant. (Reply at 15.) But Hartford and Graffia dispute that they were acting as a broker, and a broker has duties to his principal that a person dealing at arm's length does not. Count VIII remains.

## III. *Negligent Misrepresentation*

██ Hartford has moved to dismiss Count II, alleging negligent misrepresentation by a broker, contending that the Plaintiffs have not alleged that Hartford was retained by the Plaintiffs to provide information to assist them in their dealings with third parties. (Mot. ¶ 3.) In the wake of the Illinois Supreme Court's seminal opinion in *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 755, 435 N.E.2d 443, 452 (1982), there can be no recovery in tort for solely economic loss as the result of misrepresentation unless the defendant made either an intentionally false representations or made negligent misrepresentations. To state a claim for negligent misrepresentation in its post-*Moorman* form under Illinois law, the plaintiff must allege that (1) the defendant is in the business of providing information; (2) the defendant supplied information to the plaintiff for guidance in the plaintiff's business transactions; and (3) the information was supplied for guidance in the plaintiff's business dealings with third parties. *Rankow v. First Chicago Corp.*, 870 F.2d 356, 362-63 (7th Cir.1989); *Craig v. First Am. Cap. Resources*, 740 F.Supp. 530, 540 (N.D.Ill.1990); *Black, Jackson and Simmons Ins. Brokerage v. IBM Corp.*, 109 Ill.App.3d 132, 64 Ill.Dec. 730, 732, 440 N.E.2d 282, 284 (1982). A claim for negligent misrepresentation may lie against a securities broker. *See Zurad v. Lehman Bros. Kuhn Loeb*, 757 F.2d 129, 133-34 (7th Cir.1985) (stockbroker could be held liable under "business of supplying information" test); *Wallace Computers Servs. v. David Noyes & Co.*, No. 93 C 6005, slip op. at 14, 1994 WL 23110 (N.D.Ill. Jan. 20, 1994) (Plunkett, J.); *Penrod v. Merrill Lynch, Pierce, Fenner & Smith*, 68 Ill. App.3d 75, 24 Ill.Dec. 464, 466, 385 N.E.2d 376, 378 (1979).

The status of Hartford as set forth in the Complaint is ambiguous. A broker is not usually understood as being a party to the brokered transaction, yet the Plaintiffs allege that in the case of CIT and AI, the Plaintiffs purchased Dreamstreet's and Marine's joint obligations from Hartford. Although when a middleman resells an obligation one would expect the middleman's compensation to be in the form of a profit on the sale, the Complaint recites that in each case Hartford received a commission from the buyer. (Compl. ¶¶ 15, 17.) In the case of Plaintiff MELA, a more conventional transaction is described: Dreamstreet and Marine executed their obligations directly to MELA, and MELA paid Hartford a commission. (Compl. at ¶ 16.)

██ Although the transactions with CIT and AI are problematic, we cannot say as a matter of law that it is impossible for a broker retained by a lender to take the part of nominal lender in the transaction and then transfer the borrower's obligation to its principal and its principal's money to the borrower. Securities and tax laws sometimes make it advantageous to structure transactions in roundabout ways. For the purpose of this motion to dismiss we will accept Plaintiffs' characterization of Hartford and Graffia as brokers and their allegations reciting the usual duties of brokers to their principals, (Compl. ¶¶ 75, 76), as adequate to allege a broker-principal relationship.

## IV. *RICO*

The Defendants challenge the RICO claims on two grounds. We address each in turn.

### A. Section 1962—Direction or Control of the Enterprise

RICO liability is predicated upon the violation of one or more of the four subsections of 18 U.S.C. § 1962. Subsection (a) makes it unlawful for a person who has received income from a pattern of racketeering activity to use or invest such income in the acquisition of an interest in, or operation of, any enterprise engaged in or affecting interstate or foreign commerce. Subsection (b) makes it unlawful for any person, through a pattern of racketeering activity, to acquire or maintain, directly or indirectly, an interest in or control of such an enterprise. Subsection (c) makes it unlawful for a person "employed or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of" its affairs through a pattern of racketeering activity. Subsection (d) renders it unlawful to conspire to violate any of the other three. The Plaintiffs allege Hartford and Graffia violated subsections (c) and (d). (Pl.Br. at 18.)

Hartford and Graffia do not dispute that Dreamstreet and Marine constitute an "enterprise." They do dispute that the Plaintiffs have properly alleged that they conducted or participated in the conduct of its affairs. The Supreme Court discussed what it means for a person "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs" in *Reves v. Ernst & Young,* —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). In *Reves* the Court upheld the dismissal of RICO claims against an outside auditor that supplied condensed financial statements to the board of directors of a cooperative. The condensed statements omitted a footnote stating that if a gasohol plant owned by the cooperative were valued at fair market value rather than on the basis of construction costs and capitalized expenses, the cooperative could be insolvent. The district court and the court of appeals held that section 1962(c) requires "some participation in the operation or management of the enterprise itself." *Arthur Young & Co. v. Reves,* 937 F.2d 1310, 1324 (8th Cir.1991). The Eighth Circuit held that merely performing audits and explaining them to the

board of directors of the cooperative did not meet that test, *id.,* and the Court affirmed:

> In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required.

*Reves,* —— U.S. at ——, 113 S.Ct. at 1170.

■ According to the Complaint, Graffia prepared financial statements for Hera and Graffia, acting either jointly with Hartford or as its agent, arranged for the Plaintiffs to make loans to the enterprise, and knowingly transmitted false financial information about the enterprise to the Plaintiffs. It is a close question whether some direction of the enterprise should be inferred. Plaintiffs are correct that the involvement of Graffia and Hartford in the alleged racketeering scheme goes well beyond that of the auditors in *Reves.* Nevertheless, the test is not involvement but control, and we do not find that the pleaded facts reasonably lead to the inference that Graffia' or Hartford played a part in directing the Dreamstreet/Marine enterprise.

■ Hartford and Graffia were outsiders, not formally affiliated with either Dreamstreet or Marine. The allegations do not tend to show that Graffia and Hartford participated in the direction of the enterprise's affairs rather than their own. See *Reves,* —— U.S. at ——, 113 S.Ct. at 1173, 122 L.Ed.2d at 540. Neither Graffia nor Hartford had any power of control, direct or indirect, over the enterprise. It was, of course, not only to Hartford and Graffia's advantage that the Dreamstreet/Marine enterprise obtained the fraudulently induced loans; the loans were primarily for the enterprise's benefit. To the extent Hartford and Graffia were acting as a broker, they were not participating in the conduct of the enterprise. Perhaps they coached the enterprise in the art of fraud; the Complaint states that

the 1986 Dreamstreet financial statements were prepared by its auditors acting in concert with Graffia, Hartford and Ralston. (Compl. ¶ 26.) But this is too thin a speculative thread to support a reasonable inference of participation in the control or management of the enterprise.[5]

■ Our conclusion that the Plaintiffs have not alleged a violation of 18 U.S.C. § 1962(c) does not eliminate RICO liability. Though the Complaint simply includes a single "RICO" count rather than the preferred method of pleading each violation in a separate count, which makes discerning the nature of the claims difficult, there is an allegation of a RICO conspiracy in paragraph 134(c). Section 1962(a) makes it unlawful for a person who has received income from a pattern of racketeering activity to use or invest such income in the acquisition of an interest in, or operation of, any enterprise engaged in or affecting interstate or foreign commerce. The Plaintiffs have pleaded that Dreamstreet and Marine received money from racketeering activity and invested it in their enterprise and that Graffia and Hartford conspired to assist them. This adequately alleges a RICO conspiracy in violation of § 1962(d).

### B. *Pattern of Racketeering Activity*

Hartford and Graffia contend that the Plaintiffs have not sufficiently alleged a pattern of racketeering activity. The concept of a "pattern of racketeering activity" has become a RICO term of art without acquiring a clear meaning. RICO itself defines a pattern as requiring at least two acts of racketeering activity within ten years. 18 U.S.C. § 1961(5).

Precisely what constitutes a "pattern of racketeering activity" is somewhat ill-defined: it has been compared to Justice Potter Stewart's now famous obscenity test—"I know it when I see it"—set forth in *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964). *Morgan v. Bank of Waukegan*, 804 F.2d 970, 977 (7th Cir.1986) (citing *Papai v. Cremosnik*, 635

F.Supp. 1402, 1410 (N.D.Ill.1986)). The Supreme Court has recently held that courts should take a flexible approach to the pattern requirement: In RICO, Congress "envision[ed] a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amounted to, or threatened the likelihood of, continued criminal activity." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989) (overturning rule in Eighth Circuit that any number of predicate acts concerning multiple victims over six years cannot constitute a RICO pattern if they relate to a single scheme). This confirmed earlier Seventh Circuit holdings that "the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement." *Morgan*, 804 F.2d at 975–76; *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1304 (7th Cir.1987), *cert. denied*, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989).

■ In *H.J.*, 492 U.S. at 239, 109 S.Ct. at 2900, the Supreme Court held that besides showing a number of predicate acts, a civil RICO plaintiff must satisfy the so-called "continuity plus relationship" test: the predicate acts must be related to one another and pose a threat of continued criminal activity. Here the relationship prong is established; the Plaintiffs have alleged mail fraud consisting of the transmission of false and misleading financial statements in order to induce four lenders to grant four loans to the same entities. We therefore turn to the continuity prong.

■ Continuity is "both a closed- and open-ended concept." *H.J.*, 492 U.S. at 241, 109 S.Ct. at 2902. A "closed-ended" period of racketeering activity involves a course of criminal conduct which has ended. To satisfy the continuity element in a closed-ended case, the plaintiff must prove a series of related predicates enduring a "substantial period of time." Predicate acts extending

---

**5.** Possibly the Plaintiffs should have defined the "enterprise" to include Hartford, but we will not presume to change the Complaint.

over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement. *Id.* at 242, 109 S.Ct. at 2902.

■ An open-ended period of racketeering, by contrast, is a course of criminal activity lacking the duration and repetition to establish continuity. A RICO plaintiff may still satisfy the continuity requirement by showing past conduct which by its nature projects the threat of repetition, such as a racketeer's announcement that he will collect monthly "protection money." *Id.* Such a threat of continuity exists when the plaintiff can show (1) a "specific threat of repetition," (2) that the "predicate acts or offenses are part of an ongoing entity's regular way of doing business," or (3) that the defendant operates a "long-term association that exists for criminal purposes." *Id.* at 242–43, 109 S.Ct. at 2902. A RICO plaintiff may thus either demonstrate a closed-ended conspiracy that existed for such an extended period of time that a threat of future harm is implicit, or an open-ended conspiracy that, while short-lived, shows clear signs of threatening to continue into the future. *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1023 (7th Cir.1992).

■ The fraudulent activity alleged here took place over about thirteen months, from the first mailing to CIT in furtherance of the first fraudulent loan in March 1987, to the granting of the last loan by AI in April 1988. The separate mailings of Hera's 1988 and 1989 statements do not extend the period because, although these statements perpetuated the fraud, such cover-up activity does not extend the period for the purpose of pattern analysis. *Midwest Grinding,* 976 F.2d at 1024. There were no fraudulent loans thereafter, and the possibility of further fraud ceased in November, 1989 when Dreamstreet and Marine declared themselves in default.

■ We think the lapse of a substantial period of time in which it is not alleged that Dreamstreet and Marine sought fraudulent loans precludes our finding an open-ended period of racketeering activity. It does not appear from the allegations that fraud was a "regular way of doing business." Marine needed money and concealed the truth in order to borrow it, but there is no suggestion that Marine was not intended to be a legitimate business rather than a scam to swindle lenders. While the Dreamstreet/Marine enterprise might well have engaged in fraud again, the same could be said in almost any case, since dishonesty tends to become habitual. But we see nothing that could be called a specific threat of repetition.

Analyzing the fraudulent loans as a closed-end period of racketeering, we turn to the multifactor continuity test outlined in *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986), which survives *H.J. Midwest Grinding,* 976 F.2d at 1023. According to *Morgan,* continuity is a function of the length of time within which the predicate acts were committed, the number and variety of predicate acts, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. *Morgan,* 804 F.2d at 975. *See also Jones v. Lampe,* 845 F.2d 755, 756–57 & n. 4 (7th Cir.1988); *Triad Assocs. v. Chicago Housing Auth.,* 892 F.2d 583, 594 (7th Cir.1989), *cert. denied,* 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990); *Fujisawa,* 814 F.Supp. at 733.

■ The length of time here is approximately thirteen months. The number of predicate acts is not set forth in the Complaint. We may infer at least thirteen uses of the mails or wires in furtherance of the allegedly fraudulent activity.[6] However, be-

---

6. Paragraphs 58–73 show at least the following mailings. In the case of multiple documents, the Complaint does not state whether there was more than one mailing: (1) 1986 Dreamstreet statements to CIT; (2) 1987 Hera, Dreamstreet and Marine statements to CIT; (3) 1988 and 1989 Hera statements to CIT; (4) 1986 Dreamstreet, 1987 Marine and 1987 Hera statements to Multibank; (5) 1987 Dreamstreet and 1988 and 1989 Hera statements to Multibank; (6) 1986 and 1987 Dreamstreet, 1987 Marine and 1987 Hera statements to MELA; (7) 1988 and 1989 Hera statements to MELA; (8) 1986 and 1987 Dreamstreet, 1987 Marine and 1987 Hera statements to AI; and (9) 1988 and 1989 Hera statements to AI.

Additionally, paragraph 138 alleges that loan proceeds were distributed through mail or wire transfer. Because there were four loans alleged, this would constitute at least four additional uses of the mails or wires.

cause each mailing is a separate predicate act, but several mailings may be used to accomplish one fraud, when it comes to a pattern premised on acts of mail or wire fraud the volume of mailings is not dispositive. *See U.S. Textiles v. Anheuser–Busch Cos.*, 911 F.2d 1261, 1266 (7th Cir.1990).

The alleged fraudulent procurement of loans constitutes a single "scheme." Plaintiffs have claimed that each loan transaction defines a separate scheme, but multiple victims do not equal multiple schemes. *See Olive Can Co. v. Martin*, 906 F.2d 1147, 1151 (7th Cir.1990). In some cases Hartford sold the loan and in some cases the loan was made directly to the enterprise. However, the Plaintiffs have characterized Hartford as a "broker" in each case, indicating that the distinction was a matter of form rather than substance. Although in obtaining their first loan from CIT the Dreamstreet/Marine enterprise did not employ the Hera financial statements, this is not a separate "scheme"; in each case the "scheme" was to misrepresent the assets of the borrowers to obtain loans that would not otherwise have been made. So we have one scheme, four victims and three distinct injuries.[7]

This is a borderline case. A multifactor test directs the court's attention to facts to be considered; it is not a rule of decision. *See Secon Serv. Sys. v. St. Joseph Bank and Trust Co.*, 855 F.2d 406, 414 (7th Cir.1988). If these loans had been obtained within a shorter period of time, as they presumably could have been, we would be hard pressed to find a pattern or racketeering. But thirteen months are not a "few weeks or months." Four fraudulently induced loans from four different lenders based on the misstatement of the financial condition of two different corporations, each with distinct ownership and engaged in different businesses, add up, in our opinion, to a "pattern of racketeering activity," the kind of planned, repeated wrongdoing RICO was intended to deter.

7. The plaintiffs do not allege that non-party Multibank was injured. The transaction is nevertheless considered in determining whether a pattern

*Conclusion*

We deny Graffia's and Hartford's motion to dismiss the Complaint, with two exceptions. First, no claim may be based upon allegations that (a) Graffia and Hartford misrepresented to the Plaintiffs that Dreamstreet and Marine were borrowers with strong financial positions meeting the Plaintiffs' standards of creditworthiness; and (b) Graffia or Hartford knew or should have known that representations made in Dreamstreet's financial statements with respect to the nature, value and prospects of Dreamstreet's business were false or misleading. Second, the Complaint does not allege a violation of 18 U.S.C. § 1962(c). In all other respects the motion to dismiss is denied.

exists. *Deppe v. Tripp*, 863 F.2d 1356, 1367 (7th Cir.1988).